Otto T. BANG, Jr., Nancy Brataas, William G. Kirchner, Charles Berg, Gerald Knickerbocker, Ray O. Pleasant, Arne H. Carlson, Gary W. Laidig, Selma Stenberg and John Heegaard, Plaintiffs,

v.

Harold CHASE, Elizabeth Ebbott, David Durenberger, Spencer Sokolowski, Roger F. Noreen and Constance Burchette, in their capacities as the members of the State Ethical Practices Board, Jim Lord, in his capacity as the Treasurer of the State of Minnesota, Arthur C. Roemer, in his capacity as the Commissioner of the Minnesota Department of Revenue, and Gary W. Flakne, in his capacity of Hennepin County Attorney, Defendants.

No. 3–76 Civ. 272.

United States District Court, D. Minnesota, Third Division.

Dec. 14, 1977.

Jerome Truhn, and Thomas V. Seifert, Head & Truhn, Minneapolis, Minn., for plaintiffs.

Warren R. Spannaus, Atty. Gen., State of Minnesota by Richard B. Allyn, Sol. Gen., Richard A. Lockridge, Kathryn Rush, and Paul G. Zerby, Sp. Asst. Attys. Gen., St. Paul, Minn., for State defendants.

Before HEANEY, Circuit Judge, DEVITT, Chief District Judge, and ALSOP, District Judge.

## MEMORANDUM ORDER

PER CURIAM.

This case is again before this three-judge panel[1] upon plaintiffs' request to declare

---

1. A three-judge court was requested pursuant to 28 U.S.C. § 2281 and properly convened under 28 U.S.C. § 2284. Although section 2281 was repealed by Pub.L. 94–381, 90 Stat. 1119, on August 12, 1976, section 7 of Pub.L. 94–381 provided, "[t]his Act shall not apply to any action commenced on or before the date of enactment." Since this action was commenced August 2, 1976, section 2281 applies.

unconstitutional key provisions of the Minnesota Ethics in Government Act, Minn. Stat. §§ 10A.01 *et seq.* (1976), and to enjoin the enforcement of its provisions.[2]

The Ethics in Government Act is an intricate statutory attempt by the Minnesota legislature to regulate Minnesota election campaigns. The Act provides sweeping changes in the way state political campaigns are conducted and financed by establishing contribution and expenditure limitations, financing at least part of many candidates' election campaigns, and requiring extensive record keeping.

The challenged provisions of the Act: (a) limit the amount an individual may spend "on behalf or in opposition to the opponent of a candidate," Minn.Stat. § 10A.27(1). *See Expenditure Limitations, infra* ; (b) finance the election campaigns for state legislators by allowing taxpayers to designate on their income tax forms whether they wish to allocate one dollar from the state treasury to the state elections campaign fund and, if so, whether that dollar will go to an earmarked party account or to a general account, Minn.Stat. §§ 10A.30—.33. *See Campaign Financing, infra* ; (c) require an individual intending to spend more than $20 on behalf of a candidate to either obtain from the candidate prior written authorization and certification that the expenditure will not exceed the candidate's expenditure ceiling or publicly disclaim any authorization, Minn.Stat. § 10A.17(2), and require any person who solicits contributions or makes expenditures on behalf of a candidate to publicly disclose any lack of that candidate's written authorization, Minn.Stat. § 10A.17(5). *See Authorization, Certification or Disclaimer, infra.*

Plaintiffs are three incumbent Independent-Republican (IR) Senators (Bang, Brataas, Kirchner), one incumbent independent Senator (Berg), four incumbent IR members of the House (Knickerbocker, Pleasant, Carlson, Laidig), one person who had no state income tax liability in 1975 (Stenberg), and one person who claims to be a potential political contributor and spender (Heegaard).[3] They contend that the financing provisions and expenditure limitations of the Act substantially burden fundamental constitutional rights—freedom of association, freedom of speech, due process and equal protection—guaranteed by the First and Fourteenth Amendments.

Defendants are the members of the Ethical Practices Board, the State Treasurer, the Commissioner of the Department of Revenue, and the Hennepin County Attorney. They argue that the entire Act is constitutional because it advances vital interests and only incidentally infringes upon plaintiffs' rights.

At the outset it should be noted that the Minnesota legislature passed the Ethics in Government Act before the United States Supreme Court addressed the issue of campaign regulation and financing in *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Thus, when the Minnesota legislature adopted the Minnesota Act, it did not have the benefit that this court has of the Supreme Court's guidelines as contained in *Buckley* regarding the constitutional parameters surrounding the newly emerging concept of public financing of political campaigns.

*Buckley* establishes the constitutional limits of the Federal Election Campaign Act of 1971, as amended. It is dispositive of some but not all of the issues here presented. To the extent that the Minneso-

---

2. The court has subject matter jurisdiction under 28 U.S.C. § 1343 because this action is brought to redress deprivations of federal constitutional rights guaranteed by the First and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

3. The court has decided that each plaintiff has "such a personal stake in the outcome of the controversy" so as to confer standing to challenge the constitutional validity of the respective provisions. *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

ta Act parallels its federal counterpart, *Buckley* controls. To the extent that the Minnesota Act varies from the Federal Act, the general policy consideration presented in *Buckley* are of assistance.

## EXPENDITURE LIMITATIONS

The expenditure limitations of section 10A.27(1) of the Act prohibit persons or groups completely independent of a candidate from making expenditures "on behalf or in opposition to the opponent of a candidate . . . in an amount in excess of ten percent of the amount that may be spent by or on behalf of that candidate as set forth in section 10A.25."

The aggregate expenditure limit of section 10A.25(2) [4] for candidates for office of state senator in an election year is 20 cents per capita or $15,000, whichever is greater. The corresponding limit for candidates for the office of state representative in an election year is 20 cents per capita or $7,500, whichever is greater. In a non-election year, subdivision 6 limits expenditures to 20% of these amounts.

Thus when this suit was originally before the court upon plaintiffs' request for a preliminary injunction, section 10A.27(1) prevented independent individuals or groups from spending more than $1,500 "on behalf or in opposition to the opponent of a candidate" for the state Senate. The corresponding limit for expenditures on behalf of a candidate for the state House of Representatives was $750.

Immediately after the October 1, 1976 hearing on plaintiffs' request for a prelimi-

nary injunction, the court preliminarily enjoined the enforcement of the independent expenditure limitations of section 10A.27(1) of the Act. In our order of October 12, 1976, we continued this injunction in effect.

■ In the opinion of the court, the Supreme Court's invalidation of the $1,000 individual expenditure ceiling of the Federal Election Campaign Act, as amended,[5] dictates that the corresponding limitations in section 10A.27(1) of the Minnesota Act are unconstitutional. *Buckley v. Valeo*, 424 U.S. 1, 45–51, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Reducing the amount of money a person can spend on communications drastically curtails First Amendment rights.[6] As the Supreme Court observed in *Buckley*, "[b]eing free to engage in unlimited political expression subject to a ceiling on expenditures is like being free to drive an automobile as far and as often as one desires on a single tank of gasoline." *Id.* at 19 n.18, 96 S.Ct. at 634.

■ When this matter was first argued, defendants attempted to distinguish the holding in *Buckley* by pointing out that the Minnesota limitations are higher than the federal counterpart when compared with the area within which the funds will be spent; violation of the Minnesota limitations is punishable only by a civil fine of four times the excess expended while violation of the federal limit is punishable by a criminal penalty; and advisory opinions, which were not available under the Federal Act, are available under the Minnesota provisions. We were not persuaded by these distinctions then, nor are we now. As we

4. Although not directly challenged here, the court has determined that the ceilings on overall campaign expenditures of section 10A.25 are unconstitutional in their present form. *See Severability, infra.*

5. 18 U.S.C. § 608(e)(1) (1970 ed., Supp. IV).

6. As the Supreme Court observed in *Buckley v. Valeo*, 424 U.S. 1, 19, 96 S.Ct. 612, 635, 46 L.Ed.2d 659 (1976):
A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the num-

ber of issues discussed, the depth of their exploration, and the size of the audience reached. This is because virtually every means of communicating ideas in today's mass society requires the expenditure of money. The distribution of the humblest handbill or leaflet entails printing, paper, and circulation costs. Speeches and rallies generally necessitate hiring a hall and publicizing the event. The electorate's increasing dependence on television, radio, and other mass media for news and information has made these expensive modes of communication indispensable instruments of effective political speech.

have previously observed, simply because an individual is permitted some speech does not mean he may be constitutionally forbidden to engage in more. Nothing in *Buckley* suggests that higher expenditure ceilings on independent expenditures would be permissible. Rather, *Buckley* seems to invalidate all such restrictions on speech.

■ Thus we now find that the independent expenditure limitations of section 10A.27(1) of the Act, which prohibit persons or groups completely independent of a candidate from making expenditures "on behalf or in opposition to the opponent of a candidate" for state legislative office, are unconstitutional as violative of First Amendment rights.

## CAMPAIGN FINANCING

The Act provides that every individual whose income tax liability is one dollar or more may designate on his or her state income tax form that one dollar of state funds shall be paid into the state elections campaign fund. Minn.Stat. § 10A.31(1). If the taxpayer chooses to do so, he or she is given the option of assigning the dollar to either an earmarked party account or to the general account.[7] Minn.Stat. § 10A.31(2). In so doing, the taxpayer's income tax liability does not increase.

Within two weeks after certification of the results of the primary election, funds from the party accounts are distributed to the respective parties' candidates who have agreed to the contribution and expenditure limitations of section 10A.25 and whose names are to appear on the general election ballot. Minn.Stat. §§ 10A.31(6), 10A.32(3).

Funds from the general account are distributed after the general election in equal amounts to all candidates for each statewide office who received at least five·percent of the vote for that office, and to all candidates for legislative office who received at least ten percent of the vote for the office for which they ran. Minn.Stat. § 10A.31(7).

A. The party-designated tax check-off system.

Plaintiffs first challenge the basic notion that a party-designated check-off system should be used as a method for the public financing of political campaigns. They contend that since the distribution of public campaign financing money on the basis of taxpayer preference inevitably results in the disparate funding of major party candidates, it unconstitutionally burdens free speech and association and invidiously discriminates between candidates of major parties.[8]

■ This contention does not withstand analysis. In *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the Supreme Court rejected a First Amendment challenge to federal public campaign financing provisions,[9] holding that they constitute "a congressional effort, not to abridge, restrict or censor speech, but rather to use public money to facilitate and enlarge public discussion and participation in the electoral process, goals vital to a self-governing people." *Id.* at 92–93, 96 S.Ct. at 670. Therefore, the public financing provisions of the federal law were held to enhance, rather than abridge, the First Amendment rights of political candidates.

---

7. In 1975, $372,311 was designated to the state elections campaign fund pursuant to section 10A.31. Of that amount, $68,395 was designated to the IR party account, $175,259 was designated to the DFL party account, $3,488 was designated for minor parties' accounts, and $135,169 was designated to the general account.

The Commissioner of Revenue has estimated that in 1976, $440,834 was designated to the fund pursuant to section 10A.31. Of that amount, $99,188 was designated to the IR account, $187,354 was designated to the DFL party account, $3,527 was designated to minor parties' accounts, and $150,765 was designated to the general account.

8. Plaintiffs cite the fact that, in 1975, the winners of the DFL primary elections for state Senate received $1,674 from the DFL account while their IR opponents received only $824 from the IR account. DFL House candidates who won the primary election received $824 from the DFL account, while their IR opponents received only $409 from the IR account.

9. *See* I.R.C. §§ 6096, 9001–9012, 9031–9042.

*Id.* Certainly, the Minnesota Act's public financing provisions do the same.

■ Since the public financing provisions of the Act do not impinge upon the First Amendment rights of political candidates, plaintiffs' equal protection challenge also fails. Where state action is "affirmative and reformatory" in nature, creating no suspect classifications and impinging upon no constitutionally protected rights, strict judicial scrutiny is inappropriate. *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 39–40, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Instead, the reviewing court must proceed "under judicial principles sensitive to the nature of the State's efforts and to the rights reserved to the States under the Constitution." *Id.* at 39, 93 S.Ct. at 1300. *See also Buckley v. Valeo, supra,* 424 U.S. at 93–96, 96 S.Ct. 612. Under this less exacting test, the Minnesota Act must be sustained if it "bear[s] some rational relationship to [a] legitimate state purpos[e]", *San Antonio Independent School District v. Rodriguez, supra,* 411 U.S. at 40, or, in the words of the *Buckley* Court, if it furthers "sufficiently important governmental interests and has not unfairly or unnecessarily burdened the political opportunity of any party or candidate." *Buckley v. Valeo, supra,* 424 U.S. at 95–96, 96 S.Ct. at 671.

By serving to cleanse the political process, the public financing provisions of the Act serve an important governmental interest. Indeed, in the words of a House committee, unlimited private campaign spending leads

> to a closed, insulated, self-perpetuating system, dominated by special interests and unresponsive to the public will * * which often creates the impression that only the rich can run for public office, and that a candidate can buy an election

by spending large amounts of money in a campaign.

Such a situation works an inequitable hardship on the candidate who cannot compete with the resources of great wealth, but of even greater significance, it is unfair to the electorate which is entitled to have presented to it for its evaluation and judgment candidates from all walks of life and not just those persons who, because of their wealth, can conduct a campaign which resorts to techniques which are more appropriate to merchandizing a product than to familiarizing the public with a candidate's qualities as a potential public official and his program for the country.[10]

The impact of special interest contributions on the political decision making process has been of particular concern.[11] In 1972, eighteen individuals gave nearly $7.5 million to the Committee to Re-elect the President—more than the entire amount spent by Lyndon Johnson in his 1964 presidential campaign.[12] Approximately $5.3 million was given by twenty-five top donors and lenders to the McGovern campaign in 1972.[13] Special interest groups "invested" $22.6 million in the 1976 congressional campaigns, nearly double the $12.5 million spent by such groups in 1974.[14]

There is little disagreement that large campaign contributions are often given with the expectation of a political *quid pro quo* from the elected candidate. Senator Hugh Scott, former Senate Minority Leader, has stated that:

> No member of this body could be honest with himself if he did not admit that in running for reelection, he had found it necessary to accept large contributions * * * from those contributors who were willing to support his cause. * *

---

10. H.R. Rep. No. 564, 92d Cong., 1st Sess. 4 (1971).

11. *See* S. Rep. No. 981, 93rd Cong., 2d Sess. (1974); Hearings on S. 1103, S. 1954, and S. 2417 Before the Subcomm. on Privileges and Elections of the Senate Comm. on Rules and Administration, 93rd Cong., 1st Sess. (1973).

12. *Ibid.* at 66 (statement of Sen. Adlai E. Stevenson III).

13. Nicholson, *Campaign Financing and Equal Protection,* 26 Stan.L.Rev. 815, 819 (1974).

14. Common Cause, Frontline, April-May 1977, at 3.

[T]hose contributions have inevitably raised a sense of obligation. Deny it how we will, the sense of obligation persists, and all of us have been involved in the exercise. I have used it myself. When someone offers to do something for me and makes a contribution to me, I have to ask myself, what is the obligation involved. I wonder, when someone comes back later and asks me to do something— hopefully they ask me to do something I can do—would he embarrass me by asking me to do something that I should not do * * *.[15]

As the Supreme Court noted in *Buckley*, financing political campaigns through private contributions creates not only the danger of actual corruption, but it also creates the appearance of corruption and, thus, undermines public confidence in the political process.[16]

Reliance on privately raised campaign funds forces candidates to spend vital time and energy on fund raising. Such time and energy could be better spent on the development of policy and the communication of that policy to the voting public. The search for private campaign funds is, in the words of a veteran of the campaign trail, "the most demeaning, disgusting, depressing, and disenchanting part of politics."[17] The time, effort and indignity involved in private fund raising "has driven too many capable men and women away from seeking high public office. Sadly, the Nation is the poorer for this."[18]

Nor have plaintiffs adequately demonstrated that the Act's public financing provisions will unfairly or unnecessarily burden the political opportunity of minority party candidates. The mere fact that, in a given year, IR candidates received less public money from their party account than did DFL candidates provides no basis for predicting that the Act will invariably and invidiously benefit the majority party. *See Buckley v. Valeo, supra* 424 U.S. at 33, 96 S.Ct. 612.[19] The amount which taxpayers choose to designate for either party account is dependent upon many factors, including the performance of a party's previously elected candidates and the efforts of party leaders in encouraging their supporters to use the income tax check-off.[20] *Cf. Buckley v. Valeo, supra* at 32–33, 96 S.Ct. 612. Moreover, a party which receives less public financial support is free to raise money from private sources.[21] *See id.* at 95, 96

**15.** Hearings on S. 1103, S. 1954 and S. 2417 Before the Subcomm. on Privileges and Elections of the Senate Comm. on Rules and Administration, 93rd Cong., 1st Sess. at 189 (1973) (quoted in statement of Professor David Adamany of the University of Wisconsin).

**16.** *See Buckley v. Valeo*, 424 U.S. 1, 26–27, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

**17.** Statement of Senator Hubert Humphrey, 119 Cong.Rec. 14985 (daily ed. July 28, 1973).

**18.** Statement of Arnold Picker, Chairman, Ad Hoc Committee on Financing, Democratic National Committee, in Hearings on S. 1103, S. 1954 and S. 2417 Before the Subcomm. on Privileges and Elections of the Senate Comm. on Rules and Administration, 93rd Cong., 1st Sess., 7 (1973).

**19.** Indeed, while $68,395, or 18.4 percent of the total amount checked off by taxpayers was designated for the IR party account in 1975, this increased to $83,218, or 22.1 percent of the total checked off in 1976. The percentage checked off for the DFL party account decreased from $175,259, or 47.0 percent, to $164,071, or 43.6 percent, during the same period. (Statistics compiled by Leonard F. Peterson, Research Analyst, Minnesota Department of Revenue.)

**20.** Although public participation in the Minnesota income tax check-off has increased since the Act has been in effect, the check-off is utilized by a minority of taxpayers. In 1975, $372,311 was checked off for either a party-designated account or to the general account, out of a total of 1,669,794 processed individual income tax returns. This increased to $376,223 checked off on 1,584,086 processed individual income tax returns in 1976. It is estimated that $452,900 will be checked off on approximately 1,791,297 returns expected to be filed in 1977. (Statistics compiled by Leonard F. Peterson, Research Analyst, Minnesota Department of Revenue.)

**21.** Receipt of public campaign financing money may, of course, properly be conditioned upon a candidate's agreement to abide by specified expenditure limitations. *Buckley v. Valeo*, 424 U.S. 1, 57 n. 165, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). *See Severability, infra.*

S.Ct. 612. "Plainly, campaigns can be successfully carried out by means other than public financing; they have been up to this date, and this avenue is still open to all candidates." *Id.* at 101, 96 S.Ct. at 674.

It is clear that a party or candidate's demonstrated public support may properly be considered in the distribution of public campaign funds. *See Buckley v. Valeo, supra* at 94 n. 128, 96, 96 S.Ct. 612. As long as the statutory scheme is reasonably calculated toward that end, this court has no power to invalidate one legislative choice in favor of another. *Id.* at 99–100, 106, 96 S.Ct. 612. Indeed, the party-designated tax check-off system in use in Minnesota and in seven other states [22] both acts as a reasonable measure of popular support and has been cited as preferable to other plans since taxpayer designation of the recipient of public money minimizes state involvement in the distribution decision. [23]

As a citizen-mediated means for the distribution of public campaign funds, the party-designated tax check-off used in the Minnesota Act is directly analogous to statutes which allow income tax credits and deductions for political contributions. [24] In either case, the public is subsidizing the taxpayer's political contributions to the political party or candidate of his choice. *See Buckley v. Valeo, supra* at 107 n. 146, 96 S.Ct. 612. It is no more likely that tax deductible political contributions will be evenly distributed between major party candidates than that revenues from the party-designated tax check-off will be;

however, tax deductions and credits for political contributions have rarely been criticized on equal protection grounds. [25]

Plaintiffs next contend that the Act's party-designated tax check-off system is violative of various constitutional rights of taxpayers or of the voting public. First, they contend that use of the Minnesota tax form is both over- and under-inclusive since many voters may not have any state income tax liability and, conversely, many persons who have a state income tax liability may not be eligible to vote in state elections.

Concededly this provision is both over- and under-inclusive. However, there is nothing before the court from which it can determine the number of persons either improperly included or excluded. Although the court is concerned about the constitutionality of excluding persons who have no tax liability from being able to designate one dollar to the fund, without a factual showing of the number of persons affected, the court is unwilling to hold that this portion of the Act violates the Equal Protection Clause of the Fourteenth Amendment.

Second, plaintiffs contend that the party-designated tax check-off system violates a taxpayer's right to privacy of association. They contend that requiring a taxpayer to declare his political affiliation in his income tax return before the state will distribute funds to his party's candidates constitutes an infringement upon the taxpayer's First Amendment rights.

**22.** *See* Idaho Code §§ 34–2501—34–2505 (Cum. Supp.1977); Iowa Code §§ 56.18–56.26 (Supp. 1977); Ky.Rev.Stat. §§ 118.015, 141.071–141.073 (Cum.Supp.1976); Me.Rev.Stat. Tit. 36, § 5283 (Supp.1973); N.C.Gen.Stat. §§ 105–159.1 (Cum.Supp.1975); R.I.Gen.Laws § 44–30–2(e) (Supp.1976); Utah Code Ann. §§ 59–14A–99, 59–14A–100 (Supp.1977).

**23.** *See* Rosenthal, *Campaign Financing and the Constitution,* 9 Harv.J. on Legis. 359, 415 (1972); Barrow, *Regulation of Campaign Funding and Spending for Federal Office,* 5 U. of Mich.J. of L.Ref. 159, 186 (1972).

**24.** *See e. g.,* Minn.Stat. § 290.06(11) (1976); I.R.C. §§ 41, 218.

**25.** *See* Rosenthal, *supra,* at 417–418; J. Fleishman, *Public Financing of Election Campaigns: Constitutional Constraints on Steps Toward Equality of Political Influence of Citizens,* 52 N.C.L.Rev. 349, 403–404 (1973). If there is an equal protection flaw in the granting of tax deductions for political contributions, it lies in the differential benefit which tax deductions afford different classes of taxpayers. Taxpayers who do not itemize deductions receive no benefit at all. For those who do itemize deductions, the value of the political deduction will be greater for those in high tax brackets than for the poor. *Id.* at 404.

The argument that it is unconstitutional to require a taxpayer to indicate his party preference before his tax contribution will be given by the state to the political party of his choice is not persuasive, since it is impossible for the state to distribute the money unless the taxpayer's preference is known. If a taxpayer wishes to have his tax contribution paid in its entirety to the political party of his choice, he must be willing to indicate that choice on his income tax form. If he does not wish to indicate his party affiliation, he must be satisfied either to check off the general account or to make a private contribution to his political party. No statute could accomplish more.

Plaintiffs' privacy argument is particularly specious in view of the Supreme Court's decision in *Buckley* which sustained federal reporting and disclosure requirements[26] against constitutional attack. *Id.* at 64–68, 96 S.Ct. 612. If compelled public disclosure of private campaign contributions does not unconstitutionally infringe upon privacy of association and belief, surely there is no unconstitutional infringement by a statute which merely provides a taxpayer the opportunity to indicate his party preference on his tax form,[27] the contents of which are shielded under threat of criminal penalty from public view.[28]

Moreover, by giving the taxpayer the right to choose the political party to which his tax dollar will go, the Minnesota Act avoids the criticism leveled at nonpartisan account tax check-off plans. The criticism is that a taxpayer who chooses to contribute is forced to finance the dissemination of ideas with which he does not agree.[29] In *Buckley*, the Court indicated that although taxpayers need not be given the opportunity to designate the recipient of their tax contributions, public financing plans which afford such choice are less restrictive of taxpayers' First Amendment rights. *Id.* at 92 n. 125, 96 S.Ct. 612.

As a corollary to their privacy argument, the plaintiffs argue that the party-designated income tax check-off is unconstitutional because an individual who might otherwise use the check-off will be deterred by fear of politically motivated income tax audits. This argument is without merit. The use of the party-designated check-off is voluntary; an individual who does not wish to indicate his party preference may exercise his First Amendment rights either by checking off the general fund or by making private campaign contributions. *See Buckley v. Valeo, supra* at 28, 96 S.Ct. 612. The plaintiffs admit that they have no evidence that individuals who check off the I.R. account will be threatened or harassed by employees of the Minnesota Department of Revenue; without evidence, the bare allegation that Revenue Department employees will engage in retaliatory auditing is not only "highly speculative," *id.* at 70, 96 S.Ct. 612, but unworthy of consideration by this court.

---

26. *See* 2 U.S.C. §§ 431 *et seq.* (1970 ed., Supp. IV). Disclosure requirements are utilized in some form in forty-eight states. *See* Comment, *Campaign Finance Acts—An Attempted Balance Between Public Interests and Individual Freedoms,* 24 Kan.L.Rev. 345, 388 n. 367, 370 (1976).

27. In *Buckley v. Valeo, supra,* the Court indicated that exemption from compelled disclosure might be appropriate upon a factual showing that "compelled disclosure of a party's contributors' names will subject them to threats, harassment, or reprisals from either Government officials or private parties." *Id.* at 74, 96 S.Ct. at 661. There is, of course, no need for exemption from participation in the party-designated income tax check-off since designation of party preference is voluntary. Moreover, as discussed *infra*, plaintiffs have adduced no evi-

dence that by checking off the IR account, they have been subjected to any threats, harassment or reprisals from anyone.

28. Minn.Stat. § 290.611 (1976).

29. In commenting upon attempts to extend public financing to congressional campaigns, Representative Bill Frenzel stated:

   Public financing forces the taxpayer to support candidates who are in opposition to [his] own political views. Public financing denies the taxpayer the right to designate where his or her contribution will go.

   H.R.Rep. No. 93–1239, 93rd Cong., 2d Sess. 155 (1974) (Supp. views of Rep. Bill Frenzel); Comment, *Buckley v. Valeo; The Supreme Court and Federal Campaign Reform,* 76 Colum.L. Rev. 852, 885 (1976).

■ Lastly, plaintiffs contend that the party-designated tax check-off is violative of equal protection and due process because a taxpayer must choose the party to which he wishes to contribute in advance of his knowledge of that party's candidates. Plaintiffs cite the fact that in non-election years, years may pass before the preferences expressed by taxpayers on income tax forms are effectuated.[30]

We agree that a closer correlation in time between taxpayer designation of public campaign funds and their eventual distribution would be desirable and a proper subject of further legislative scrutiny. However, the existence of this time lapse does not render the Act's public financing scheme unconstitutional. Since it was held in *Buckley* that a tax check-off system which allows the taxpayer no choice as to where his contribution will go meets constitutional standards,[31] *a fortiori* a system which affords the taxpayer some choice cannot be invalid because it does not achieve a perfect correlation between the taxpayer's desire and the tax dollar's appropriation.

In summary, we find no constitutional infirmity in those sections of the Minnesota Ethics in Government Act which establish a party-designated tax check-off system for the collection of public campaign funds.

B. The distribution of public funds to legislative candidates.

■ Plaintiffs also challenge the method used to distribute specific party funds to legislative primary winners. Under the Act, winners of the primary election of each party for the state Senate and House of Representatives share equally in the funds allocated to their respective offices from their party account. Minn.Stat. § 10A.31(5)(f). Thus the funding for the specific party accounts is determined by taxpayer preference on a state-wide basis while the party accounts are required to be distributed at the legislative district level.

There is no counterpart to this provision in the Federal Election Campaign Act, as amended. Funding under the federal scheme measures support on a nation-wide basis for a national office. A federal equivalent to the Minnesota system would collect disparate amounts for each party on a national basis and distribute these funds on a state-wide basis to candidates for the United States Senate and House of Representatives.

In the opinion of the court, the aggregate political party preferences expressed by all the state taxpayers in Minnesota have no rational relation to the support for particular parties or for particular candidates within legislative districts. Under this distribution scheme, a party with state-wide plurality can unfairly disadvantage its opponents in those districts where it enjoys little district support. Accordingly, we find that the method of distribution of public campaign funds required by section 10A.31(5)(f) invidiously discriminates between candidates of different political parties and abridges the First Amendment right of political association.

## AUTHORIZATION, CERTIFICATION, OR DISCLAIMER

Section 10A.17 of the Minnesota Ethics in Government Act provides, in relevant part:

Subd. 2. No person or persons acting in concert other than the candidate and the treasurer of the candidate's principal campaign committee may make expenditures of more than $20 with the authorization or consent, express or implied, of a candidate or his agent, or under the control, direct or indirect, of a candidate or his agent on behalf of a candidate without receiving from the treasurer of that candidate's principal campaign committee (i) prior written authorization and (ii) certification that the expenditures will not exceed the limits on expenditures as set forth in sections 10A.25 and 10A.27.

 \*  \*  \*  \*  \*  \*

---

**30.** Indeed, 40% of the funds designated by taxpayers on their Minnesota income tax forms in 1975 will not be distributed to candidates until the 1978 elections for state wide officers.

**31.** *See Buckley v. Valeo*, 424 U.S. 1, 92–93, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

Subd. 5. Any political committee, political fund or person who solicits or accepts contributions or make[s] expenditures on behalf of any candidate without the written authorization of the candidate shall publicly disclose its lack of authorization. In all written communications with those from whom it solicits or accepts contributions or to whom it makes expenditures, the committee, fund or person shall state in writing and in conspicuous type that it is not authorized by the candidate and that the candidate is not responsible for its activities. A similar oral statement shall be included in all oral communications. A similar written statement shall be included in conspicuous type on the front page of all literature and advertisements published or posted and a similar oral statement included at the end of all broadcast advertisements by [the] committee, fund or person in connection with the candidate's campaign.

Plaintiffs contend that these restrictions violate the First Amendment because they create an invalid prior restraint on speech, regulate the content of speech, and are unconstitutionally vague and overbroad.

Defendants respond that these provisions serve several basic state interests and that any First Amendment infringement is only incidental. They argue that these provisions enable candidates to supervise expenditures so as not to exceed the limits on campaign expenditures established in sections 10A.25 and 10A.27. Defendants also argue that the provisions protect the public's right to know the source of all authorized expenditures.

■ We agree with plaintiffs that section 10A.17(2) cannot stand. The primary purpose of that provision is to aid candidates in complying with the campaign expenditure limitations found in sections 10A.25 and 10A.27. Since those sections are unconstitutional as written,[32] the govern-

mental purpose which would have justified the First Amendment infringement imposed by section 10A.17(2) no longer exists. *See Buckley v. Valeo,* 424 U.S. 1, 75–76, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

■ We find, however, that the governmental interests served by section 10A.17(5) are sufficient to justify any incidental infringement upon First Amendment rights. This section serves important governmental interests both in enabling the public to determine which communications have been authorized by a particular candidate and in protecting a candidate from unauthorized communications which do not accurately reflect his political position. *Cf. Buckley v. Valeo, supra* at 81, 96 S.Ct. 916.

■ Plaintiffs contend that the use of the phrase "expenditures on behalf of any candidate" leaves the application of this section sufficiently uncertain as to render it unconstitutionally vague. Although the quoted phrase is not expressly defined in the Act, its meaning is sufficiently plain from the statutory context in which it appears. "Expenditure" is defined in the Act as the use of money or other valuable asset "for the purpose of influencing the nomination * * * or election of any candidate to office." Minn.Stat. § 10A.01(10)(a). Thus, "expenditures on behalf of any candidate" clearly means expenditures made for the purpose of influencing the nomination or election of any candidate. Although this definition could potentially encompass expenditures made in the furtherance of public discussion of current issues as well as those expenditures made in advocacy of a political result, *see Buckley v. Valeo, supra* at 79, 96 S.Ct. 612, the Minnesota State Ethical Practices Board has narrowly interpreted "expenditures on behalf of any candidate" to be limited to communications which directly refer to an individual's candidacy and which urge his nomination or election.[33] As interpreted, § 10A.17(5) is

---

**32.** *See Expenditure Limitations, supra,* and *Severability, infra.*

**33.** *See* Minnesota State Ethical Practices Board, Advisory Opinions Nos. 4, 8 and 11

(issued on July 17, 1974, September 23, 1974, and November 13, 1974, respectively). In *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the Supreme Court recognized that statutory vagueness can be alleviat-

"directed precisely to that spending that is unambiguously related to the campaign of a particular * * * candidate," and constitutes no undue infringement on First Amendment rights. *Id.* at 80, 96 S.Ct. 612.

## SEVERABILITY

The only remaining issue is whether our holdings today invalidating certain segments of the new Minnesota Ethics in Government Act require us to enjoin the enforcement of the entire Act.

Minn.Stat. § 645.20 states:

If any provision of a law is found to be unconstitutional and void, the remaining provisions of the law shall remain valid, unless the court finds the valid provisions of the law are so essentially and inseparably connected with, and so dependent upon, the void provisions that the court cannot presume the legislature would have enacted the remaining valid provisions without the void one; or unless the court finds the remaining valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent.

Thus this section creates a presumption of severability which is rebutted only if the court concludes the Minnesota legislature would not have enacted the valid portions without the void ones.

■ Today we have sustained plaintiffs' challenge to the expenditure limitations found in section 10A.27(1) of the Minnesota Ethics in Government Act. In examining the remaining provisions of the Act which involve the same subject matter in order to determine legislative intent, we find that the application of the expenditure limitations found in section 10A.25 is unconstitu-

tional in some circumstances as well. Section 10A.25(2) sets aggregate limitations on the amount which can be spent "by a candidate or by a political committee, political fund or individual which makes expenditures with the authorization, express or implied, and under the control, direct or indirect, of the candidate or his agents" for each elective office. Since this section imposes a ceiling on the total expenditures of a candidate, it necessarily places an unconstitutional limitation on the candidate's personal expenditures on his own behalf from his own funds. The Court in *Buckley* observed that

[t]he candidate, no less than any other person, has a First Amendment right to engage in the discussion of public issues and vigorously and tirelessly to advocate his own election and the election of other candidates.

\* \* \* \* \* \*

The primary governmental interest served by the Act—the prevention of actual and apparent corruption of the political process—does not support the limitation on the candidate's expenditure of his own personal funds * * *. Indeed, the use of personal funds reduces the candidate's dependence on outside contributions and thereby counteracts the coercive pressures and attendant risks of abuse to which the Act's contribution limitations are directed. *Buckley v. Valeo,* 424 U.S. 1, 52–53, 96 S.Ct. 612, 651, 46 L.Ed.2d 659 (1976).

For these reasons, the limitations in the Minnesota Act on a candidate's personal expenditures are unconstitutional.

■ In addition, the Act imposes limitations on overall campaign expenditures by candidates seeking nomination and election

ed by a comprehensive series of advisory opinions from a properly empowered administrative agency. It held that the Federal Election Commission was not so empowered since the right to obtain advisory opinions was limited to candidates, federal officeholders and political committees, and the Commission was directed to respond to such · requests only "within a reasonable time." *Id.* at 40–41 n. 47, 96 S.Ct. 612. By contrast, the Minnesota State Ethical Prac-

tices Board is directed to issue advisory opinions as to the Act's requirements upon the request of anyone who "wish[es] to use the opinion to guide [his] own conduct," and opinions must be issued by the Board within thirty days of the request's receipt unless a majority of the Board agrees to an extension of time. Minn.Stat. § 10A.02(12).

to state office regardless of whether they have agreed to limit their expenditures as a condition of accepting state funds. Minn. Stat. §§ 10A.25(2), (3), (6). The *Buckley* Court held that Congress could not impose an absolute limitation on overall campaign expenditures, *Buckley v. Valeo, supra,* 54–58, 96 S.Ct. 612, but could condition acceptance of public funds on an agreement by the candidate to abide by specified expenditure limitations, *id.* at 57 n. 165, 96 S.Ct. 612. Although sections 10A.32(3) and 10A.31(6) of the Minnesota Act condition acceptance of public funds on an agreement by the candidate that authorized expenditures on his behalf will not exceed the expenditure limits as set forth in section 10A.25, the expenditure limitations of section 10A.25 apply regardless of whether the candidate chooses to accept public funds. Thus this aspect of section 10A.25 of the Minnesota Act is unconstitutional under *Buckley* as violative of the First Amendment right to freedom of speech.

In the opinion of the court, sections 10A.27(2), (3), (4), 10A.28, and 10A.32(1), (3) are so essentially and inseparably connected with sections 10A.25 and 10A.27(1) that the legislature would not have enacted the former without the latter provisions. Accordingly, judgment shall be entered declaring the following provisions of the Minnesota Ethics in Government Act unconstitutional and enjoining defendants from enforcing and carrying out the same: Minn.Stat. §§ 10A.17(2); 10A.25; 10A.27; 10A.28; 10A.32(1), (3); and in addition 10A.17(6), 10A.29 and 10A.34 as applied to the first enumerated sections.

We have also found the method of distribution of public campaign funds to legislative candidates as required by section 10A.31(5)(f) to be unconstitutional. We therefore enjoin the distribution of funds from the party accounts of the state elections campaign fund to candidates for state Senate and state House of Representatives under section 10A.31(5)(f) and enjoin the

enforcement of section 10A.34 as applied to that section. We further direct that unless a method for the distribution of public campaign funds to legislative candidates based on taxpayer preference within legislative districts or another constitutional method for distribution is enacted by March 1, 1978, all money then credited to the party accounts of the state elections campaign fund for distribution to legislative candidates and any money so credited thereafter shall revert to that fund to which it would have been credited in the absence of this legislation. Reversion shall continue until such time as a constitutionally permissible method of distribution has been enacted.[34]

As previously noted, the Minnesota Ethics in Government Act was passed before the Supreme Court addressed the issues of governmental regulation of election campaigns and public campaign financing. The Minnesota legislature will now have the benefit of the Supreme Court's guidance in *Buckley* together with the opinion of this court when it again addresses the issue of campaign regulation and public financing of political campaigns in Minnesota.

Upon the foregoing,

IT IS ORDERED That the clerk enter judgment declaring the following provisions of the Minnesota Ethics in Government Act unconstitutional and enjoining defendants from enforcing the same: Minn.Stat. §§ 10A.17(2); 10A.25; 10A.27; 10A.28; 10A.31(5)(f); 10A.32(1), (3); and in addition 10A.17(6); 10A.29; and 10A.34 as applied to the first enumerated sections.

IT IS FURTHER ORDERED That if a constitutional method for the distribution of public campaign funds from party accounts to legislative candidates has not been enacted by March 1, 1978, all money credited to the party accounts of the state elections campaign fund for distribution to legislative candidates as of that date, and all money so credited thereafter, shall revert to that fund to which it would have been credited in the absence of this legislation.

---

34. Under section 10A.31(5), the amount to be so distributed to legislative candidates in calendar year 1978 and thereafter would be 70 percent of the money credited to each party account.