09-3760-cv(L), 09-3941-cv(CON)
Green Party of Connecticut v. Garfield

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term 2009

(Argued January 13, 2010                                      Decided July 13, 2010)

Docket Nos. 09-3760-cv(L), 09-3941-cv(CON)

GREEN PARTY OF CONNECTICUT, S. MICHAEL DEROSA, LIBERTARIAN PARTY OF CONNECTICUT, ELIZABETH GALLO, JOANNE P. PHILIPS, ROGER C. VANN, BARRY WILLIAMS, and ANN C. ROBINSON,

*Plaintiffs-Appellees*,

AMERICAN CIVIL LIBERTIES UNION OF CONNECTICUT and ASSOCIATION OF CONNECTICUT LOBBYISTS,

*Plaintiffs*,

v.

JEFFREY GARFIELD, in his official capacity as Executive Director and General Counsel of the State Elections Enforcement Commission, and RICHARD BLUMENTHAL, in his official capacity as Attorney General,

*Defendants-Appellants*,

PATRICIA HENDEL, ROBERT N. WORGAFTIK, JACLYN BERNSTEIN, REBECCA M. DOTY, ENID JOHNS ORESMAN, DENNIS RILEY, MICHAEL RION, SCOTT A. STORMS, and SISTER SALLY J. TOLLES, each in his or her official capacity as a Member or Official of the Office of State Ethics, BENJAMIN BYCEL, in his official capacity as Executive Director of the Office of State Ethics,

*Defendants*,

AUDREY BLONDIN, COMMON CAUSE OF CONNECTICUT, CONNECTICUT CITIZEN ACTION GROUP, KIM HYNES, and TOM SEVIGNY,

*Intervenor-Defendants-Appellants.*[*]

---

[*] The Clerk of Court is directed to amend the official caption in this case to conform to the listing of the parties above.

1

Before KEARSE, CABRANES, and HALL, *Circuit Judges*.

Appeal from a September 2, 2009 judgment of the United States District Court for the District of Connecticut (Stefan R. Underhill, *Judge*). After a bench trial, the District Court determined that Connecticut's Citizen Election Program (CEP), a statutory scheme providing public funds for candidates running for state office, violates the First and Fourteenth Amendments to the United States Constitution.

We reverse the District Court with respect to one count, applying the standard set forth in *Buckley v. Valeo*, 424 U.S. 1, 94-96 (1976), and concluding that the CEP does not unconstitutionally discriminate against minor-party candidates. We affirm the District Court with respect to two other counts, holding that the CEP's so-called "trigger provisions" violate the First Amendment in a manner similar to the law struck down in *Davis v. Federal Election Commission*, 128 S. Ct. 2759 (2008).

The District Court disposed of an additional count in a partial final judgment entered February 11, 2009. We address an appeal of the February 11, 2009 partial judgment in a separately filed opinion.

Judge Kearse dissents in part in a separate opinion.

GREGORY T. D'AURIA, Senior Appellate Counsel (Richard Blumenthal, Attorney General, Perry Zinn Rowthorn, Associate Attorney General, Maura Murphy Osborne, Assistant Attorney General, *on the brief*) Office of the Attorney General of the State of Connecticut, Hartford, Connecticut, *for defendants-appellants*.

IRA M. FEINBERG, Hogan & Hartson LLP, New York, New York (Monica Y. Youn, Angela Migally, and Mimi Marziani, Brennan Center for Justice at the New York University School of Law, New York, New York, and David Dunn, Hogan & Hartson LLP, New York, New York, *on the brief*), *for intervenor-defendants-appellants*.

2

MARK J. LOPEZ, Lewis, Clifton & Nikolaidis, P.C., New York, New York (Benjamin Sahl, American Civil Liberties Union Foundation, New York, New York, *on the brief*), *for plaintiffs-appellees.*

Benjamin Barr, Center for Competitive Politics, Alexandria, Virginia, *for amicus curiae Center for Competitive Politics in support of plaintiffs-appellees.*

William R. Maurer, Institute for Justice, Seattle, Washington, *for amici curiae Dean Martin, Robert Burns, Rick Murphy, Arizona Free Enterprise Club's Freedom Club PAC, and Arizona Taxpayers Action Committee in support of plaintiffs-appellees.*

JOSÉ A. CABRANES, *Circuit Judge*:

This is the first of two opinions in which we consider a constitutional challenge to certain provisions of Connecticut's Campaign Finance Reform Act (CFRA).

The CFRA, enacted in 2005, represents a comprehensive effort by the Connecticut General Assembly to change the way that campaigns for state office in Connecticut are financed. We consider here a challenge to the Citizens Election Program (CEP), a part of the CFRA that provides public money to candidates running for state office. In our second opinion, which we file separately, we consider a constitutional challenge to restrictions imposed by the CFRA on campaign contributions (and the solicitation of campaign contributions) by state contractors, lobbyists, and their families. *See Green Party of Conn. v. Garfield*, No. 09-0599-cv(L), __ F.3d __ (2d Cir. July 13, 2010).

After a bench trial, the United States District Court for the District of Connecticut (Stefan R. Underhill, *Judge*) ruled, in part, that the CEP violated the First Amendment and the Equal Protection Clause of the Fourteenth Amendment by invidiously discriminating against so-called *minor* political parties and their candidates. *See Green Party of Conn. v. Garfield*, 648 F. Supp. 2d 298 (D. Conn. 2009)

3

("*Green Party II*"). We reverse that part of the District Court's judgment and hold that the CEP does not, on this record, invidiously discriminate against minor parties and their candidates.

The District Court also ruled that certain discrete components of the CEP—its so-called "trigger provisions," which include the CEP's "excess expenditure provision" and "independent expenditure provision"—violate the First Amendment by impermissibly restricting the right of candidates and other individuals and organizations to spend their own funds on campaign speech. We affirm that part of the District Court's judgment because we agree that the CEP's trigger provisions violate the First Amendment.

## BACKGROUND

We first describe the history of the CEP. We then outline its provisions and briefly recount the procedural history of this action.

## I.     The History of the CEP

The CFRA—which includes the CEP—was passed in response to several corruption scandals in Connecticut. *Id.* at 306-07. The most widely publicized of the scandals involved Connecticut's former governor, John Rowland. In 2004, Rowland was accused of accepting over $100,000 worth of gifts and services from state contractors, including vacations, flights on a private jet, and renovations to his lake cottage. Rowland accepted the gifts, it was alleged, in exchange for assisting the contractors in securing lucrative state contracts. Rowland resigned amidst the allegations, and in 2005 pleaded guilty—along with two aides and several contractors—to federal charges in connection with the scandal. Rowland was fined and sentenced to a year and a day in federal prison. *See id.* at 307.

Sadly, the ignominy of public corruption was not limited to Rowland. As the District Court discussed in detail, the "Rowland scandal was but one of the many corruption scandals involving

4

elected officials in state and local government that helped earn the state the nickname 'Corrupticut.'" *See id.* at 307-08 (cataloging the scandals); *see also id.* at 307 & n.9 (discussing the decline of the reputation of Connecticut's state government).

It was in the wake of those scandals that Connecticut lawmakers resolved to enact "expansive campaign finance reforms." *Id.* at 309. In the summer of 2005, Governor M. Jodi Rell established the Campaign Finance Reform Working Group (the "Working Group"), a collection of six state representatives and six state senators who were charged with drafting a new campaign finance reform law. After holding televised hearings for three months, the Working Group proposed an expansive bill, much of which would be incorporated into the final version of the CFRA. *See id.* at 309-10.

In the fall of 2005, Governor Rell called a special session of the General Assembly for the sole purpose of considering the Working Group's proposed bill. After a month of debate, the General Assembly passed the CFRA, and Governor Rell signed it into law. *See id.* at 300-11. As the District Court set forth in detail, several contemporaneous statements from General Assembly members, as well as Governor Rell, explain that the CFRA was passed "to combat actual and perceived corruption in state government." *Id.* at 311.

Much of the CFRA went into effect on January 1, 2006, but "2008 marked the first election cycle with candidates participating in the CEP public financing scheme." *Id.* at 330; *see also* Conn. Gen. Stat. § 9-702(a) (providing that the CEP becomes effective for the legislative elections in 2008 and for the statewide elections in 2010). Before it went into effect, the CEP was twice amended. *See Green Party II*, 648 F. Supp. 2d at 311, 319-20.

5

## II.     The Provisions of the CEP

The CEP is a complicated statutory scheme, *see* Conn. Gen. Stat. § 9-702 *et seq.*, and the District Court took great care in explaining each of its provisions. *See Green Party II*, 648 F. Supp. 2d. at 311-20. We describe only those provisions of the CEP that are relevant to our decision here.

### A.     Qualification Criteria

Candidates qualify for CEP funding by satisfying one of two types of qualifying criteria—one type for "major party" candidates and one type (with two subtypes) for "minor party" candidates. Under what we will refer to as the CEP's "statewide qualifying criteria," candidates qualify for CEP funding if they are running on the ticket of a major party. *See* Conn. Gen. Stat. § 9-702(a). A "major party" is defined by the CEP as a party that either (a) had a candidate for governor in the last election who received at least 20% of the vote, or (b) has as members at least 20% of the registered voters in the state. *See id.* § 9-372(5). There are, and have been for some time, only two parties that have achieved "major party" status in Connecticut: the Republican Party and the Democratic Party. *Green Party II*, 648 F. Supp. 2d at 311.

For candidates who are *not* running on the ticket of a major party—that is, for candidates who are running on the ticket of a minor party or who have no party affiliation—there are alternative ways of qualifying for CEP funding. Under what we will refer to as the CEP's "single-election qualifying criteria," a minor-party candidate can qualify for funding in a specific race if a member of his or her party achieved a certain threshold percentage of the vote in the same race in the last election. *See* Conn. Gen. Stat. § 9-705(c)(1), (g)(1). A minor-party candidate can qualify for a full grant of CEP funding if a member of his or her party received 20% of the vote in the same race in the last election; a candidate can qualify for two-thirds of the full amount if a member of his or her party received 15% of the vote in the same race in the last election; and a candidate can qualify

6

for one-third of the full amount if a member of his or her party received 10% of the vote in the same race in the last election.  *See id.*

Under what we will refer to as the "petitioning criteria," minor-party candidates can also qualify for CEP funding by collecting a certain number of signatures of those eligible to vote in the race in which they are running.  A minor-party candidate can receive a full CEP grant if he or she collects a number of eligible signatures equal to 20% of the votes cast in the same race in the last election; the candidate can receive two-thirds of the full amount if he or she collects a number of eligible signatures equal to 15% of the votes cast in the same race in the last election; and the candidate can receive one-third of the full amount if he or she collects a number of eligible signatures equal to 10% of the votes cast in the same race in the last election.  *See id.* § 9-705(c)(2), (g)(2).

Finally, all candidates—whether they qualify under the statewide criteria, the single-election criteria, or the petitioning criteria—must raise a specified amount of money through small "qualifying contributions" of $100 or less.  *See id.* § 9-704.  The required amount that candidates must raise varies depending on the office sought: candidates for governor, for instance, must raise $250,000 in qualifying contributions, whereas candidates for state representative must raise $5,000 in qualifying contributions.  *Id.* § 9-704(a)(1), (4).  Otherwise-qualified candidates do not receive CEP funding until they have raised the required qualifying contributions.

**B.      Distribution Formulae**

Once a candidate qualifies for public funds under the CEP, the amount of public money that he or she receives is determined by the CEP's "distribution formulae."

7

### 1.      Primary Election Grants

Candidates seeking the endorsement of a major party must run in primary elections that are governed by state law. Those candidates receive CEP funding for the primary election in the following amounts: candidates for governor receive $1.25 million; candidates for other statewide offices receive $375,000; candidates for the state senate receive $35,000; and candidates for the state house of representatives receive $10,000. *Id.* § 9-705(a)(1), (b)(1), (e)(1), (f)(1). Like all CEP grants, those amounts will, in the future, be adjusted for inflation. *Id.* § 9-705(d), (h).

A candidate running for the General Assembly receives more money for the primary election if the election takes place in a district that is considered "one-party dominant" and the candidate is a member of the "dominant" party. (As discussed in greater detail below, we will also refer to "one-party dominant" districts as "safe" districts.) A "one-party dominant" district is defined as a district in which there is a difference of twenty percentage points or more between the number of registered voters for the two major parties. For example, if 55% of the voters in a district were registered Democrats and 35% of the voters were registered Republicans (with 10% unaffiliated or registered with a minor party), there would be a twenty-percentage-point difference in the number of Democratic and Republican voters, and the candidates running in the Democratic primary would receive extra money: the grant for the Democratic candidate for the state senate would increase to $75,000, and the grant for the Democratic candidate for the state house of representatives would increase to $25,000. *See id.* § 9-705(e)(1)(A), (f)(1)(A).

Currently, no minor party in Connecticut selects its candidates by means of primary elections, but defendants contend that, if a minor party were to hold primary elections, that party's candidates would be eligible for CEP funding. *See Green Party II*, 648 F. Supp. 2d at 312 n.16.

8

### 2. General Election Grants

For the general election, the CEP provides the following "full" grants: candidates for governor receive $3 million; candidates for other statewide offices receive $750,000; candidates for the Connecticut Senate receive $85,000; and candidates for the Connecticut House of Representatives receive $25,000. *See* Conn. Gen. Stat. § 9-705(a)(2), (b)(2), (e)(2), (f)(2).

Those full grants may be reduced in certain circumstances. For instance, if a major-party candidate is running unopposed, the CEP grant is reduced to 30% of the full amount. *See id.* § 9-705(j)(3). If a major-party candidate has no major-party competitor but is running against a minor-party candidate who has not qualified for (or accepted) CEP funding, the major-party candidate receives 60% of the full amount. *See id.* § 9-705(j)(4). If a major-party candidate is running against a minor-party candidate who has, in fact, qualified for CEP funding (or if the minor-party candidate has raised or spent non-public funds equal to the amount of funding the candidate would have received under the CEP), the major-party candidate receives the full grant. *See id.*

### C. Expenditure Limits

By participating in the CEP and accepting public funds, candidates agree to accept certain limits on the total amount of money they may spend on their campaigns. In essence, candidates that participate in the CEP may spend only the amount they receive in public funds, plus the amount they raise through the required "qualifying contributions." *See* Conn. Gen. Stat. § 9-702(c). Participating candidates are also permitted to spend a small amount of their own personal funds in certain circumstances. *See id.* §§ 9-702(c), 9-710(c).

**D.     Trigger Provisions**

Finally, under the CEP's so-called "trigger provisions," candidates receive additional funding when certain conditions are triggered. There are two trigger provisions: the "excess expenditure" provision and the "independent expenditure" provision.

The District Court concisely explained the excess expenditure provision:

> The CEP provides matching funds for participating candidates who are outspent by a non-participating opponent—who is not bound by any expenditure limit—in the primary or the general election ("excess expenditure trigger"). Conn. Gen. Stat. § 9-713. If a non-participating candidate receives contributions or spends more than an amount equal to the participating candidate's expenditure limit, then the participating candidate is eligible to receive up to four additional grants, each worth 25% of the full grant. *Id.* The excess expenditure grants are distributed whenever the non-participating candidate receives contributions or makes expenditures exceeding 100%, 125%, 150%, and 175% of the expenditure limit for that particular office.

*Green Party II*, 648 F. Supp. 2d at 315-16.

The independent expenditure provision is similar to the excess expenditure provision, but it applies to private individuals and organizations who make independent expenditures in support of a candidate for office. Again, the District Court concisely explained this provision:

> The CEP also contains a trigger provision tied to independent expenditures made by non-candidate individuals and political advocacy groups . . . . Conn. Gen. Stat. § 9-714. A qualifying independent expenditure is "an expenditure that is made without the consent, knowing participation, or consultation of, a candidate or agent of the candidate committee and is not a coordinated expenditure," *id.* § 9-601(18), and that is made "with the intent to promote the defeat of a participating candidate." *Id.* § 9-714(a). Matching funds under this provision are triggered when non-candidate individuals or groups make independent expenditures advocating the defeat of a participating candidate, that in the aggregate, and when combined with the spending of the opposing non-participating candidates in that race, exceed the CEP grant amount. *Id.* § 9-714(c)(2). Funds are distributed to the participating candidate on a dollar-per-dollar basis to match the amount of the independent expenditure(s) in excess of the full grant amount. *Id.* § 9-714(a).

10

Notably, independent expenditures made in *support* of a candidate (without expressly advocating the defeat of an opponent) do not count towards the independent expenditure trigger, meaning individuals and groups are entitled to make unlimited independent expenditures in support of a candidate without triggering CEP matching funds for that candidate's opponents. *See generally id.* § 9-714[.]

*Id.* at 316.

III.    **This Action**

Plaintiffs-appellees ("plaintiffs") brought this action in 2006 claiming that certain provisions of the CFRA (including the CEP) violated the First and Fourteenth Amendments to the United States Constitution.

A.    **The Parties**

Plaintiffs include two minor parties operating in Connecticut: the Green Party of Connecticut and the Libertarian Party of Connecticut. Plaintiffs also include several Connecticut-based lobbyists and state contractors, as well as Michael DeRosa, a member of the Green Party who has run, in the past, for the state senate and for Secretary of the State on the Green Party ticket. *See Green Party II*, 648 F. Supp. 2d at 302-06; J.A. 49-52 (Compl. ¶¶ 10-17).[1]

Defendants-appellants ("defendants") include Jeffrey Garfield, who is named in his official capacity as the Executive Director and General Counsel of the State Elections Enforcement Commission, and Richard Blumenthal, who is named in his official capacity as the Attorney General of the State of Connecticut. *See Green Party II*, 648 F. Supp. 2d at 306; J.A. 52 (Compl. ¶¶ 18-19).

The parties in this action also include several individuals and entities who successfully moved to intervene as defendants. The intervenor-defendants-appellants include three former major-party candidates for state office and two advocacy groups: Connecticut Common Cause and Connecticut

_____

[1] Citations to the "Complaint" are to the amended complaint filed by the Green Party of Connecticut and others on September 29, 2006.

11

Citizens Action Group. *See Green Party II*, 648 F. Supp. 2d at 306. The intervenor-defendants defend the constitutionality of the CEP.

## B. The Claims

Plaintiffs have organized their claims into five counts.[2] In Count One, plaintiffs claim that the CEP's qualification criteria and distribution formulae, Conn. Gen. Stat. §§ 9-702(b), 704-05, violate the First Amendment and the Equal Protection Clause of the Fourteenth Amendment by invidiously "discriminat[ing]" against minor parties and their candidates. *See* J.A. 66 (Compl. ¶ 53). In Counts Two and Three, plaintiffs assert First Amendment challenges to the CEP's excess expenditure provision, Conn. Gen. Stat. § 9-713 (Count Two), and the CEP's independent expenditure provision, *id.* § 9-714 (Count Three). *See* J.A. 66-67 (Compl. ¶¶ 54-55).

In Counts Four and Five, plaintiffs assert First Amendment challenges to aspects of the CFRA that do *not* involve the CEP. In Count Four, plaintiffs challenge the CFRA's bans on contributions (and the solicitation of contributions) by state contractors, lobbyists, and their families. Conn. Gen. Stat. §§ 9-610(g)(h), 9-612(g). In Count Five, plaintiffs challenge disclosure requirements imposed by the CFRA on state contractors. *Id.* § 9-612(h)(2); *see* J.A. 67 (Compl. ¶¶ 56-57).

This opinion addresses Counts One, Two, and Three. Our second, separately filed opinion addresses Count Four. Plaintiffs have not pursued Count Five in these appeals; thus we do not address it.

---

[2] There are two operative complaints in this action: (1) an "amended complaint" filed by the Green Party of Connecticut and others on September 29, 2006, and (2) a "second amended complaint" filed by the Association of Connecticut Lobbyists and Barry Williams on January 16, 2007. In discussing the various "counts" asserted by plaintiffs, we refer to the counts contained in the complaint filed by the Green Party. *See* note 1, *ante.* Count Four of that complaint is, for all relevant purposes, identical to the claims raised in the complaint filed by the Association of Connecticut Lobbyists.

**C.      Proceedings in the District Court**

The District Court disposed of plaintiffs' claims by means of two separate judgments.  The District Court first granted summary judgment for defendants on Count Four, holding that the CFRA's contribution and solicitation bans did not violate the First Amendment.  *See Green Party of Conn. v. Garfield*, 590 F. Supp. 2d 288 (D. Conn. 2008) ("*Green Party I*").  On February 11, 2009, the District Court entered a partial final judgment for defendants with respect to Count Four.  *See* Fed. R. Civ. P. 54(b).  Plaintiffs filed a timely appeal of that partial final judgment (2d Cir. Docket No. 09-0599-cv(L)), which we address in our separately filed opinion.

The District Court then held a bench trial and, at the end of the trial, granted judgment to plaintiffs on the remaining counts—Counts One, Two, and Three.  *See Green Party II*, 648 F. Supp. 2d 298.  With respect to Count One, the District Court determined that "the CEP impose[d] an unconstitutional, discriminatory burden on minor party candidates' First Amendment-protected right to political opportunity."  *Id.* at 300.  With respect to Counts Two and Three, the District Court "conclude[d] that the CEP's excess expenditure and independent expenditure provisions . . . unconstitutionally burden[ed] the plaintiffs' exercise of their First Amendment rights."  *Id.* at 302.  Accordingly, in a September 9, 2009 final judgment, the District Court declared the CEP unconstitutional and entered a permanent injunction prohibiting defendants from enforcing each of the CEP's provisions.  *See id.* at 374.   The District Court then stayed the injunction pending this appeal.  *See Green Party of Conn. v. Garfield*, No. 3:06-cv-01030, Docket Entry No. 399 (D. Conn. Sept. 29, 2009).

Defendants filed a timely appeal of the District Court's September 9, 2009 judgment on Counts One, Two, and Three, and we address that appeal in this opinion.

13

**DISCUSSION**

"We review the district court's findings of fact after a bench trial for clear error and its conclusions of law *de novo*." *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 38-39 (2d Cir. 2009) (quotation marks omitted). There were, in this case, very few factual disputes for the District Court to resolve at trial. Instead, much of the record in this case consisted of undisputed facts, and in any event, nearly all of the District Court's assessment of plaintiffs' claims involved either pure issues of law or the "application of . . . facts to draw conclusions of law." *Scribner v. Summers*, 84 F.3d 554, 557 (2d Cir. 1996). We therefore review much of the District Court's analysis *de novo*. *See id.* ("The district court's application of . . . facts to draw conclusions of law . . . is subject to *de novo* appellate review." (citing *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1575 (2d Cir. 1994))); *see also Bose Corp. v. Consumers Union*, 466 U.S. 485, 501 (1984); *In re Complaint of Messina*, 574 F.3d 119, 128 (2d Cir. 2009); *Davis v. N.Y. City Hous. Auth.*, 278 F.3d 64, 79 (2d Cir. 2002).

**COUNT ONE:**     **Whether the CEP Unconstitutionally Discriminates Against Minor-Party Candidates**

In Count One, plaintiffs claim that the CEP violates the First Amendment and the Equal Protection Clause of the Fourteenth Amendment by invidiously "discriminat[ing]" against minor-party candidates. *See* J.A. 66 (Compl. ¶ 53). Plaintiffs' challenge is focused on the CEP's "qualification criteria," which are the criteria by which candidates qualify to receive CEP funding, as well as the CEP's "distribution formulae," which are the formulae that establish the amount of money that the CEP provides to participating candidates. *See id.* According to plaintiffs, the CEP's qualifying criteria and distribution formulae violate the Constitution because they impermissibly burden the "political opportunity" of minor-party candidates. *See Buckley v. Valeo*, 424 U.S. 1, 95-96 (1976) (holding that a public financing system may violate equal protection if it "unfairly or unnecessarily burden[s] the political opportunity of any party or candidate").

14

The District Court granted judgment for plaintiffs on Count One. The Court determined that the CEP imposed "a severe, discriminatory burden on the political opportunity of minor party candidates," and it held that "despite presenting compelling government interests, the state ha[d] failed to demonstrate how the CEP [was] narrowly tailored to advance those government interests." *Green Party II*, 648 F. Supp. 2d at 361-62.

In our view, the District Court erred in its judgment for plaintiffs on Count One. We conclude that the Connecticut General Assembly enacted the CEP "in furtherance of sufficiently important governmental interests," and we hold that the CEP's qualification criteria and distribution formulae do not, on this record, "unfairly or unnecessarily burden[ ] the political opportunity of any party or candidate." *Buckley*, 424 U.S. at 95-96. We therefore reverse the District Court on Count One and grant judgment for defendants.

## I.    The Legal Standard for Plaintiffs' Claim of Unconstitutional Discrimination

In determining the legal standard to apply to Count One, we hew to the Supreme Court's analysis in *Buckley v. Valeo*, which is the principal binding precedent addressing whether a system of public financing for elections unconstitutionally discriminates against minor-party candidates.

*Buckley* considered, in part, a 1970 federal statute that created a system of public financing for presidential election campaigns. *See Buckley*, 424 U.S. at 85. Several individuals and entities, including minor parties and prospective candidates, *see id.* at 7-8, challenged the law. They claimed, among other things, that it violated the First Amendment and the equal protection component of the Due Process Clause of the Fifth Amendment[3] by "discriminating" against minor-party candidates. *See id.* at 93.

_____

[3] "Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." *Buckley*, 424 U.S. at 93.

15

As we set forth in greater detail below, the CEP differs in some ways from the presidential-candidate financing system at issue in *Buckley*, and our analysis must account for those differences. We are, nonetheless, compelled to apply the legal standard articulated in *Buckley*, as that case addressed exactly the type of claim raised in Count One: a challenge to a public financing system on the ground that it unconstitutionally "discriminates" against minor-party candidates.

We acknowledge that another Supreme Court decision, issued after *Buckley*, ruled on a similar challenge to a public financing system. *See Bang v. Chase*, 442 F. Supp. 758 (D. Minn. 1977), *summarily aff'd sub nom.*, 436 U.S. 941 (1978). That ruling, however, was a summary affirmance of a district court judgment and therefore provides little guidance. As the Supreme Court clarified a year before issuing its summary affirmance in *Bang*, an "unexplicated summary affirmance settles the issues for the parties, and is not to be read as a renunciation by th[e] Court of doctrines previously announced in [its] opinions after full argument." *Mandel v. Bradley*, 432 U.S. 173, 176 (1977) (quotation marks omitted). We therefore heed the Court's warning that "'[a]scertaining the reach and content of summary actions may itself present issues of real substance,'" *id.* (quoting *Hicks v. Miranda*, 422 U.S. 332, 345 n.14 (1975)), and we do not attempt to divine whether the Supreme Court adopted the district court's reasoning in *Bang* or whether the Court affirmed on an entirely different rationale. *See, e.g.*, *Bush v. Vera*, 517 U.S. 952, 996 (1996) (Kennedy, J., concurring) ("We do *not* endorse the reasoning of the district court when we order summary affirmance of the judgment." (emphasis added)); *Mandel*, 432 U.S. at 176 ("Because a summary affirmance is an affirmance of the judgment only, the rationale of the affirmance may *not* be gleaned solely from the opinion below." (emphasis added)); *see also Morse v. Republican Party*, 517 U.S. 186, n.21 (1996) ("We . . . note that a

16

summary affirmance by this Court is a 'rather slender reed' on which to rest future decisions." (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 784-85 n.5 (1983))).[4]

We also decline plaintiffs' invitation to look for guidance from *Davis v. Federal Election Commission*, 128 S. Ct. 2759 (2008), in deciding plaintiffs' discrimination claim in Count One.[5]  *Davis* involved an entirely different claim: the *Davis* plaintiffs challenged the so-called "Millionaire's Amendment," which imposed a "penalty"—in the form of a disadvantageous "asymmetrical regulatory scheme"—on candidates for Congress who spent large amounts of their own money on their campaigns.  *Id.* at 2766, 2771.  *Davis* accordingly addressed a law that burdened the "fundamental" First Amendment right to spend one's own money on one's own campaign.  *See id.* at 2771 ("[W]e agree with Davis that this scheme impermissibly burdens his First Amendment right to spend his own money for campaign speech."); *see also id.* (recognizing "the fundamental nature of the right to spend personal funds for campaign speech").  Putting aside the CEP's trigger provisions, which we address below in connection with Counts Two and Three, the CEP does not impose a penalty on a candidate who spends his or her own money on a campaign, for in every race candidates can decline to participate in the CEP.[6]  *See id.* at 2772 ("[T]he choice involved in *Buckley*

---

[4] Indeed, Minnesota's public financing system, which was addressed in *Bang*, can be distinguished in many ways from the CEP, and the CEP appears to be far more generous to minor-party candidates than the Minnesota system.  Thus, we disagree with the dissent's reliance on *Bang*; in our view, the Supreme Court's summary affirmance in that case could have rested on numerous rationales that have no bearing on this case.

[5] As set forth below, however, we do look to *Davis* in deciding the claims plaintiffs raise in Counts Two and Three, which are distinct in many ways from plaintiffs' claim of unconstitutional discrimination in Count One.

[6] We disagree with the dissent's reading of *Davis*, especially its claim that "[a] candidate's First Amendment rights are burdened when the state provides funds only, or in greater amount, to his or her opponent, thereby increasing the opponent's relative position."  Dissenting Op. at 2 (citing *Davis*).  If that were the case, the First Amendment would prohibit any public financing system that distinguished between plausible candidacies and hopeless candidacies.  Yet *Buckley* could

17

was quite different from the choice imposed by [the Millionaire's Amendment].  In *Buckley*, a candidate, by forgoing public financing, could retain the unfettered right to make unlimited personal expenditures. . . . The choice imposed by [the Millionaire's Amendment] is not remotely parallel to that in *Buckley*.").  *Davis*, therefore, is inapposite.

In any event, *Davis* in no way suggested that it was overruling *Buckley*.  Yet if *Davis*'s analysis were applied here, it could not be reconciled with *Buckley*.  As we discuss in greater detail below, *Buckley* placed the burden on the *plaintiffs* to "show[] that the election funding plan disadvantage[d] nonmajor parties by operating to reduce their strength below that attained without any public financing."  424 U.S. at 98-99 (emphasis added).  *Davis*, on the other hand, put the burden on the *government* to defend the statute in question.  *See* 128 S. Ct. at 2772-74.  *Buckley*, moreover, required that the presidential-campaign financing system be justified by a "sufficiently important" state interest, 424 U.S. at 95-96; *see* note 7, *post*; whereas *Davis* applied a more searching standard and required that the Millionaire's Amendment be justified by a "compelling state interest," 128 S. Ct. at 2772 (quotation marks omitted).  Because *Buckley*, not *Davis*, addressed the same type of claim as the one raised here, and because there is no indication that *Davis* was meant to overrule *Buckley*'s analysis of the presidential-campaign financing system (even *sub silentio*), we look to *Buckley* for the legal standard by which to assess plaintiffs' claim of unconstitutional discrimination in Count One.

---

not have been clearer that the government has an "interest in not funding hopeless candidacies with large sums of public money," and that interest "necessarily justifies the withholding of public assistance from candidates without significant public support."  424 U.S. at 96; *see also id.* at 97-98 (clarifying that the "Constitution does not require the Government to finance the efforts of every nascent political group," for "[s]ometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike" (quotation marks omitted); *id.* at 97 ("[T]he Constitution does not require Congress to treat all declared candidates the same for public financing purposes . . . [as] there are obvious differences in kind between the needs and potentials of a political party with historically established broad support, on the one hand, and a new or small political organization on the other." (citation and quotation marks omitted)).

18

We therefore closely examine the legal standards applied in *Buckley*, and we describe how the District Court did—and did not—apply those standards correctly.

A. **The Standard Set Forth in** *Buckley v. Valeo*

*Buckley* first determined that the public financing system was "a congressional effort, not to abridge, restrict, or censor speech, but rather to use public money to facilitate and enlarge public discussion and participation in the electoral process, goals vital to a self-governing people." 424 U.S. at 92-93. Accordingly, *Buckley* rejected the plaintiffs' First Amendment challenge out of hand, holding that the presidential-candidate financing system only "further[ed]," and did "not abridge[ ]," the "pertinent First Amendment values." *Id.*

Turning to the discrimination claim—that is, the claim that the presidential-candidate financing system violated the requirement of equal protection of the laws in its differential treatment of minor-party candidates and major-party candidates—*Buckley* initially questioned whether the "exacting scrutiny" standard should apply to the system. *Id.* at 93-94. *Buckley* cited several precedents and observed that, at the time, a "principle ha[d] been developed that restrictions on access to the electoral process must survive exacting scrutiny." *Id.* Yet *Buckley* distinguished those precedents, finding them inapplicable because they "dealt primarily with state laws requiring a candidate to satisfy certain requirements in order to have his name appear on the ballot." *Id.* at 94. Such laws, *Buckley* reasoned, were "direct burdens not only on the candidate's ability to run for office but also on the voter's ability to voice preferences regarding representative government and contemporary issues." *Id.* A public financing system, in contrast, was "not restrictive of voters' rights and less restrictive of candidates' [rights]," because the system did "not prevent any candidate from getting on the ballot or any voter from casting a vote for the candidate of his choice." *Id.* As a

19

result, *Buckley* determined that "public financing is generally *less restrictive* of access to the electoral process than the ballot-access regulations dealt with in prior cases." *Id.* at 95 (emphasis added).

*Buckley* did not, however, complete that line of reasoning and establish a less searching standard for equal protection challenges to public financing systems. Instead, *Buckley* determined that the presidential-candidate financing system could be upheld even assuming, for the sake of analysis, that the correct standard was "exacting scrutiny." After distinguishing the precedents that had applied the "exacting scrutiny" standard, *Buckley* held: "*In any event*, Congress enacted [the presidential-candidate financing system] in furtherance of sufficiently important governmental interests and has not unfairly or unnecessarily burdened the political opportunity of any party or candidate." *Id.* at 95-96 (emphasis added).

Following *Buckley*, therefore, the starting point for a court in determining whether a public financing system unconstitutionally discriminates against minor parties is to assume, for the sake of analysis, that the correct standard is the version of "exacting scrutiny" articulated in *Buckley*. Under that standard, a court must first examine whether the system was "enacted . . . in furtherance of sufficiently important governmental interests." *Id.* at 95.[7] The court must then determine whether the system "burden[s] the political opportunity of any party or candidate" in a way that is "unfair[ ]" or "unnecessar[y]." *Id.* at 96. If the public financing system fares favorably under that two pronged test, the inquiry is over—the system does not violate the Constitution.

_____

[7] We note that *Buckley* also refers to the requisite governmental interest as "vital" or "significant." 424 U.S. at 94, 96. The Supreme Court recently clarified that "exacting scrutiny" requires "a *sufficiently important* governmental interest." *Citizens United v. Fed. Election Comm'n*, 130 S. Ct. 876, 914 (2010) (emphasis added) (quotation marks omitted); *see* note 9, *post*. Thus, in applying the exacting scrutiny standard here, we use the term "sufficiently important" to describe the governmental interest that the Constitution requires. We note, however, that our analysis would be no different if we required a "vital" or "significant" governmental interest because the interests served by the CEP would meet both of those standards.

20

If, however, the public financing system fails under *Buckley*'s version of the "exacting scrutiny" standard—that is, if the system furthers *insufficiently* important governmental interests, or if the system does, in fact, burden the political opportunity of a party or candidate in a way that is *unnecessary* or *unfair*—then the court must proceed to a second step of the inquiry: the court must finish the line of reasoning that *Buckley* left unresolved and determine whether a less searching standard applies.

Here, in resolving plaintiffs' claim in Count One, we are not required to perform that second step of the inquiry because, as we set forth in greater detail below, we, like the Supreme Court in *Buckley*, reject plaintiffs' claim of unconstitutional discrimination even applying *Buckley*'s version of "exacting scrutiny." Nonetheless, we conclude that if, in another case, a court determines that a public financing system *cannot* withstand *Buckley*'s version of "exacting scrutiny," the court must proceed to the second step of the inquiry, finish the line of reasoning that *Buckley* left unresolved, and determine whether a less searching standard applies.[8]

\*     \*     \*

In sum, when a plaintiff claims that a public financing system violates the First Amendment and the Equal Protection Clause in its differential treatment of minor-party candidates and major-party candidates, a court should employ the following analysis: The court should first assume that *Buckley*'s version of "exacting scrutiny" applies and determine (a) whether the system was enacted in furtherance of a sufficiently important governmental interest and (b) whether the system burdens the political opportunity of a party or candidate in a way that is unfair or unnecessary. If the system

---

[8] The dissent would affirm the District Court on Count One and strike down the CEP. *See* Dissenting Op. 2-3. Were we to follow the dissent's rationale, therefore, we *would* be required to perform this second step of the inquiry and determine whether a less searching standard applies. This the dissent does not do.

21

fails under *Buckley*'s version of the "exacting scrutiny" standard, the court should then complete *Buckley*'s unresolved line of reasoning and determine whether a less searching standard applies. If the court determines that a less searching standard applies, the court should then evaluate the public financing system under that less searching standard.

**B.      The District Court's Erroneous Application of Strict Scrutiny**

Before proceeding to the merits of plaintiffs' discrimination claim, we must clarify that the District Court erred in applying strict scrutiny to evaluate plaintiffs' claim.

The District Court began its analysis by applying the correct legal standard, as it first examined, at length, whether the CEP "'unfairly or unnecessarily burden[ed] the political opportunity of any party or candidate'"—that, of course, is one part of *Buckley*'s version of the "exacting scrutiny" standard. *Green Party II*, 648 F. Supp. 2d at 333-34 (quoting *Buckley*, 424 U.S. at 96). Ultimately, the District Court concluded that the CEP did, in fact, impermissibly burden the political opportunity of minor-party candidates. That is a legal conclusion that we reverse, as set forth below.

Nonetheless, assuming, for the sake of analysis, that the District Court was correct to hold that the CEP impermissibly burdened the political opportunity of minor-party candidates, the Court was, at that point, required to proceed to a second step of the inquiry—to determine whether a less searching standard applied in evaluating plaintiffs' discrimination claim. Yet the District Court did exactly the opposite: it held that "strict scrutiny"—a *more* searching standard—applied in evaluating plaintiffs' discrimination claim.[9]

---

[9] Alternatively, the District Court may have believed that "strict scrutiny" and "exacting scrutiny" were the same standard. *See, e.g.*, *Green Party II*, 648 F. Supp. 2d at 350 (noting at one point that "'exacting scrutiny,' *i.e.*, strict scrutiny, should apply"). But as the Supreme Court has recently clarified, those standards are different. *Compare Citizens United*, 130 S. Ct. at 898 (explaining that "strict scrutiny" requires "the Government to prove that the restriction furthers a compelling

In applying strict scrutiny, the District Court relied on two cases from our sister Circuits, *Daggett v. Commission on Governmental Ethics & Election Practices*, 205 F.3d 445, 466 (1st Cir. 2000), and *Rosenstiel v. Rodriguez*, 101 F.3d 1544, 1553 (8th Cir. 1996). In those cases, candidates claimed that a state public financing system violated the First Amendment because it was overly "coercive," effectively *requiring* that every candidate accept public money. The courts applied strict scrutiny because they concluded that the right to decline public funds—and to raise and spend one's own money in an election campaign—was a "fundamental" right protected by the First Amendment.

We have no occasion to address whether strict scrutiny was the correct standard to evaluate the claims raised in *Daggett* and *Rosenstiel*. We note only that the claims raised in those cases were far different from the claim raised by plaintiffs in Count One: the plaintiffs in *Daggett* and *Rosenstiel* claimed that a public financing system was overly "coercive" and thereby violated the First Amendment, whereas plaintiffs here claim that a public financing system unconstitutionally discriminates in its differential treatment of minor-party candidates and major-party candidates. The District Court's reliance on *Daggett* and *Rosenstiel* was, therefore, misplaced.

It is, instead, *Buckley* that provides the best guidance in this context, as *Buckley* addressed the same type of claim that plaintiffs raise in Count One. Again, as we have explained, in no event does *Buckley* suggest that "strict scrutiny"—a standard that is *more* demanding than "exacting scrutiny"—applies to the type of claim raised in Count One.

In sum, the District Court erred in applying strict scrutiny.

---

interest and is narrowly tailored to achieve that interest" (quotation marks omitted)), *with id.* at 914 (explaining that "exacting scrutiny" requires "a substantial relation" between the restriction and "a sufficiently important government interest" (quotation marks omitted)).

**II.      The Merits of Plaintiffs' Claim of Unconstitutional Discrimination**

Having clarified the legal standard with which to evaluate plaintiffs' claim of unconstitutional discrimination in Count One, we now turn to the merits of that claim. As explained above, we will follow *Buckley*'s example and assume for the sake of analysis that Buckley's version of "exacting scrutiny" applies. Thus we ask (a) whether the CEP was enacted in furtherance of a sufficiently important governmental interest and (b) whether the CEP burdens the political opportunity of a party or candidate in a way that is *unfair* or *unnecessary*. *See Buckley*, 424 U.S. at 95-96.

The answer to the first question—whether the CEP furthers a sufficiently important governmental interest—is straightforward. As *Buckley* held, "public financing as a means of eliminating improper influence of large private contributions furthers a significant governmental interest." *Id.* at 96. The District Court found that the CEP was enacted in furtherance of several goals, including to eliminate improper influence on elected officials. *See Green Party II*, 648 F. Supp. 2d at 309 (explaining that the CEP was "[s]purred in large part by the fall-out from the corruption scandals that culminated in the resignation of Governor Rowland and his subsequent indictment and conviction"). Accordingly, the District Court held that the CEP was enacted to further a sufficiently important governmental interest. *See id.* at 351. We agree with that holding.

The answer to the second question—whether the system burdens the political opportunity of a candidate in a way that is unfair or unnecessary—is more complicated. Plaintiffs claim, primarily, that three aspects of the CEP impermissibly burden their political opportunity: (1) the CEP's single-election qualification criteria, (2) the CEP's statewide qualification criteria, and (3) the CEP's distribution formulae. We address each aspect of the CEP in turn.

24

### A. The Single-Election Qualification Criteria

The District Court determined that the CEP's single-election qualification criteria, *see generally* Conn. Gen. Stat. § 9-705, impermissibly burdened the political opportunity of minor-party candidates because the criteria "ma[de] it extremely difficult for minor party candidates to become eligible for even partial public funding," *Green Party II*, 648 F. Supp. 2d at 344. We cannot agree with that application of law to fact.

#### 1. The CEP May Condition Public Funds on a Showing of Popular Support in the Previous Election

As an initial matter, *Buckley* held that a public financing system may condition a grant of public money on a showing that the candidate already enjoys a certain threshold level of popular support. The reason is twofold: First, the government has an "interest in not funding hopeless candidacies with large sums of public money," and that interest "necessarily justifies the withholding of public assistance from candidates without significant public support." *Buckley*, 424 U.S. at 96 (citation omitted). Thus the "Constitution does not require the Government to finance the efforts of every nascent political group," for "[s]ometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike." *Id.* at 97-98 (quotation marks omitted); *see also id.* at 97 ("[T]he Constitution does not require Congress to treat all declared candidates the same for public financing purposes . . . [as] there are obvious differences in kind between the needs and potentials of a political party with historically established broad support, on the one hand, and a new or small political organization on the other." (citation and quotation marks omitted)). In other words, *Buckley* recognized that if the Constitution were to require the presidential-candidate financing system to fund every minor-party candidate, the Constitution would provide the means for fly-by-night candidates to "raid the United States Treasury." *Id.* at 98 (quotation marks omitted).

The second reason that a public financing system may condition public money on a showing of popular support is that limiting an election to a small number of strong candidates "serves the important public interest against providing artificial incentives to splintered parties and unrestrained factionalism." *Id.* at 96 (quotation marks omitted). That is, to fund every minor-party candidate would risk a fractured and chaotic election, "artificially foster[ing] the proliferation of splinter parties." *Id.* at 98 (quotation marks omitted).

Accordingly, the CEP may, consistent with the First Amendment and the Equal Protection Clause, distinguish between candidates who can, and who cannot, make a preliminary showing of public support, providing funds to those who can and withholding funds from those who cannot. In addition, "popular vote totals in the last election are a proper measure of public support." *Id.* at 99 (citing *Jenness v. Fortson*, 403 U.S. 431, 439-40 (1971)). The CEP's use of vote totals from the previous election, therefore, is a permissible way to distinguish between candidates who do and do not enjoy the required threshold level of popularity.

> **2.** **We Draw from *Buckley* Four Principles to Evaluate Whether the CEP's Qualification Criteria Impose a Burden on Political Opportunity That Is "Unfair" or "Unnecessary"**

Having established that it is permissible for the CEP to condition public funding on a preliminary showing of public support—and that the CEP may use prior vote totals to measure that support—we now ask whether the CEP's single election qualification criteria of 10%, 15%, and 20% of the vote in the past election are set so high as to burden the political opportunity of a party or candidate in a way that is unfair or unnecessary. Although *Buckley* did not expressly define "unfair" or "unnecessary," we draw from *Buckley*'s analysis four principles that illuminate what *Buckley* meant by those terms.

(i) A public financing system may condition public funds on a threshold level of public support that is relatively high, as *Buckley* held that a public financing system may "require 'some preliminary showing of a *significant* modicum of support' as an eligibility requirement for public funds." *Buckley*, 424 U.S. at 96 (quoting *Jenness v. Fortson*, 403 U.S. at 442 ) (emphasis added, citation omitted); *see also Buckley*, 424 U.S. at 96 (concluding that the government's "interest in not funding hopeless candidacies . . . necessarily justifies the withholding of public assistance from candidates without *significant* public support" (emphasis added)); *cf. id.* (noting that the government has been "held to have important interests in limiting places on the ballot to those candidates who demonstrate *substantial* popular support" (emphasis added)).  In other words, a public financing system need not provide funding to every candidate who can demonstrate *some* public support; the system may, instead, condition public money on a preliminary showing of "significant" public support.

That is not to say, of course, that *any* threshold would pass constitutional muster.  *Buckley* established an important role for courts in evaluating whether public financing systems unconstitutionally discriminate against a candidate or party, instructing courts to determine whether

a public financing system is appropriately tailored[10] to avoid a burden on political opportunity that is unfair or unnecessary.

(ii) Yet *Buckley* also cautioned that there was, "[w]ithout any doubt[,] a range of formulations" of public financing systems that "would sufficiently protect the public fisc and not foster factionalism, and would also recognize the public interest in the fluidity of our political affairs." *Id.* at 103-04. *Buckley* made clear, moreover, that in establishing the required threshold level of public support, "the choice of the percentage requirement that best accommodate[d] the competing interests involved was for Congress to make." *Id.* at 103. Accordingly, although courts play an important role in assessing whether a public financing system is properly tailored, *Buckley* warned that a court's constitutional review should be circumscribed by deference to the legislative branch in its choice from among the "permissible range" of qualification criteria. *See id.* at 103-04.

---

[10] We note that the version of "exacting scrutiny" that *Buckley* applied in evaluating the challenge to the presidential campaign financing system did not require that the system be *tailored* to the asserted government interests. *Buckley* did not, for instance, evaluate whether the presidential-candidate financing system was "substantially related" to the government's interest in limiting the improper influence of donors. *See Citizens United*, 130 S. Ct. at 914 (explaining that "exacting scrutiny" typically requires "a substantial relation" between the law and "a sufficiently important governmental interest" (quotation marks omitted)). Nor did *Buckley* apply a different standard and ask whether the presidential public financing system was "closely drawn" or "narrowly tailored." Instead, *Buckley* expressed the concept of *tailoring* in somewhat different terms: a public financing system may violate equal protection if it burdens the political opportunity of a party or candidate in a way that is *unnecessary* or *unfair*. *Buckley*, 424 U.S. at 96.

We think, nonetheless, that *Buckley*'s standard encompassed a tailoring requirement. In asking whether a burden is *unnecessary*, the standard implies that, although a public financing system may impose *some* burden on the political opportunity of a party or candidate, it may not impose a burden that is substantially greater than necessary to achieve the desired outcome. Thus we think it is accurate to say that a court evaluating a claim of unconstitutional discrimination must determine whether a public financing system is appropriately *"tailored"* to avoid a burden on the political opportunity of a party or candidate that is unfair or unnecessary.

28

(iii) We also note with care that *Buckley* placed the evidentiary burden of demonstrating unconstitutional discrimination squarely on the plaintiffs. *Buckley*'s approval of the presidential-candidate financing system rested largely on the fact that the plaintiffs had "made *no showing* that the election funding plan disadvantage[d] nonmajor parties by operating to reduce their strength below that attained without any public financing." *Id.* at 98-99 (emphasis added). In other words, in this context, the evidentiary burden is not on the government to show that a public financing system comports with the Constitution; it is on the plaintiffs to show that the system does not. To determine whether the plaintiffs have succeeded, moreover, the central question a court must ask is whether the plaintiffs have shown that the system has "operat[ed] to reduce their strength below that attained without any public financing." *Id.*

(iv) Finally, in upholding the presidential-candidate financing system, *Buckley* instructed that courts should avoid reasoning based on speculation and should, instead, require tangible evidence of the "practical effects" of the public financing system. *See id.* at 101 (upholding the system in part because "[a]ny risk of harm to minority interests is speculative due to [a general] lack of knowledge of the practical effects of public financing"); *see also id.* at 97 n.131 (declining to "rule out the possibility of concluding in some future case, *upon an appropriate factual demonstration*, that the public financing system invidiously discriminates against nonmajor parties" (emphasis added)). Thus, when a court evaluates a claim like the one presented here by asking whether the public financing system has "operat[ed] to reduce the[ ] strength" of minor parties "below that attained without any public financing," *id.* at 98-99, the court should avoid speculative reasoning and focus instead on the evidence, if any, of the system's practical effects.

\*      \*      \*

29

In sum, although *Buckley* did not expressly define "unfair" or "unnecessary," we draw from

*Buckley* four principles that clarify the meaning of those terms:

> (i) A public financing system may establish qualification criteria that condition public funds on a showing of "significant" public support. *See Buckley*, 424 U.S. at 96.
>
> (ii) There is a range of permissible qualification criteria, and although a public financing system must be tailored to avoid an unfair or unnecessary burden on the political opportunity of a party or candidate, a court must defer to a legislature's choice of criteria so long as those criteria are drawn from the permissible range. *See id.* at 103-04.
>
> (iii) In assessing whether a burden is unfair or unnecessary, the central question is whether the *plaintiffs* have shown that the system has reduced the "strength" of minor parties below that attained before the system was put in place. *Id.* at 98-99.
>
> (iv) To determine whether the "strength" of minor parties has been reduced, a court should avoid speculative reasoning and instead focus on the evidence, if any, of the system's "practical effects." *Id.* at 101.

We bear those principles in mind as we assess the CEP's single-election qualification criteria.

### 3. Under *Buckley*'s Four Principles, the CEP's Single-Election Qualification Criteria Are, on This Record, Constitutional

Acknowledging that the CEP may condition public funds on a "significant" showing of

public support in the previous election, *Buckley*, 424 U.S. at 96, our intuition suggests that the CEP's

single-election qualification criteria—20% of the vote for full funding, 15% for two-thirds funding,

and 10% for one-third funding—come close to the outer edge of the constitutionally permissible

range. A public financing system must account for the "potential fluidity of American political life,"

*id.* at 97 (quotation marks omitted), including the fact that minor-party candidates do, occasionally,

defeat major-party opponents. Conditioning public funds on too high of a showing in the previous

election risks entrenching the major parties and shutting out the rare minor-party candidate who is

able to garner enough public support to win an election.

30

Nevertheless, following *Buckley*'s example, we must look beyond our intuition to the concrete evidence of the CEP's "practical effects." In so doing, we find that data from the 2008 election contradict our intuition and show that a substantial number of minor-party candidates will be eligible for public funding in 2010 under the single-election qualification criteria. Indeed, over *one third* of the minor-party candidates (fifteen out of forty) who ran in the 2008 General Assembly elections received at least 10% of the vote, thereby qualifying themselves (or another member of their party) to receive partial funding in the same race in the 2010 election. *Green Party II*, 648 F. Supp. 2d at 324. Five of those fifteen candidates—representing fully *one eighth* of all minor-party candidates—received over 20% of the vote and qualified for *full* funding in 2010. *Id.* Those record facts show that, although the CEP's qualification criteria are high, they are not, as our intuition suggested, set so high as to shut-out minor-party candidates who enjoy public support.[11]

---

[11] The presidential campaign financing system at issue in *Buckley* provided full funding to candidates from "major parties." 424 U.S. at 87. "Major party" was defined as "a party whose candidate for President in the most recent election received 25% or more of the popular vote." *Id.* The system provided partial funding to candidates from "minor parties." "Minor party" was defined as "a party whose candidate received at least 5% but less than 25% of the vote at the most recent election." *Id.* Minor-party candidates received "a portion of the major-party entitlement determined by the ratio of the votes received by the party's candidate in the last election to the average of the votes received by the major-parties' candidates." *Id.* at 88.

It is difficult to compare the qualifying criteria of the presidential campaign financing system to the qualifying criteria of the CEP. On one end, the presidential campaign financing system appears to have involved less demanding qualifying criteria, as partial funding began at 5% of the vote in the last election (compared to 10% under the CEP). But on the other end, the presidential-campaign financing system also appears to have involved more demanding qualifying criteria, as full funding was not made available until a party received 25% of the vote in the last election (compared to 20% under the CEP). Moreover, the presidential-campaign financing system provided funding only if a party's candidate received 5% of the *nationwide* vote for president—undoubtedly a difficult achievement for a minor party. By contrast, the CEP provides funding if a minor party achieves only 10% of the vote of a single state legislative district—a more attainable goal. The CEP, therefore, makes it both more difficult and less difficult for minor parties to qualify for funding.

In any event, nothing in *Buckley* suggested that the qualifying criteria for the presidential-campaign financing system were the most stringent criteria that could be found permissible under

Furthermore, even if the CEP's single-election qualification criteria impose some burden on the political opportunity of minor-party candidates, to evaluate whether the burden is unfair or unnecessary we must examine principally whether plaintiffs have shown that the CEP has "operat[ed] to reduce their strength below that attained without any public financing." *Buckley*, 424 U.S. at 98-99. Searching the record, we find insufficient evidence in support of that claim. To the contrary, uncontroverted facts in the record show that minor-party candidates as a whole are arguably *stronger*—and certainly not weaker—under the CEP.

In 2006, the election immediately before the CEP went into effect, *zero* minor-party candidates received between 15% and 19% of the vote and *one* minor-party candidate received more than 20% of the vote in legislative races. *Green Party II*, 648 F. Supp. 2d at 322-23. Yet in 2008, after the CEP went into effect for legislative elections, minor-party candidates achieved more success at the polls: *four* minor-party candidates received between 15% and 19% of the vote and *five* minor-party candidates received more than 20% of the vote in legislative races. *Id.* at 324. This shows that, insofar as particular minor-party candidates are failing to qualify for public financing because of the CEP's high qualification criteria, minor-party candidates as a whole are nonetheless just as strong—if not stronger—than they were before the CEP went into effect.[12] Their political

the Constitution.

[12] Although plaintiff Michael DeRosa appears to have done somewhat *worse* in his 2008 race for state senate than the two previous times he ran for that office, *see Green Party*, 649 F. Supp. 2d at 304, we look to how minor-party candidates fared in 2008 *as a whole*. That, we think, is the better measure of the CEP's effect on minor parties and their candidates, for examining the success of all minor-party candidates tends to diminish the idiosyncracies of individual races in which minor-party candidates could suffer setbacks due to myriad factors unrelated to campaign financing.

opportunity, therefore, does not appear to have been burdened in a way that is unfair or unnecessary.[13]

We recognize that in reaching this conclusion, we have relied on data from only one election. Once the CEP has been in place for additional election cycles, there may develop a more complete picture of its effect on minor-party candidates. Following *Buckley*, therefore, "we of course do not rule out the possibility of concluding in some future case, upon an appropriate factual demonstration," that the CEP's single-election qualification criteria *have*, in fact, "operat[ed] to reduce the[] strength" of minor parties "below that attained without any public financing." 424 U.S. at 97 n.131, 98-99. At present, however, and on the record before us, there is insufficient evidence to conclude that the CEP has burdened the political opportunity of minor-party candidates in a way that is unfair or unnecessary.[14]

\* \* \*

---

[13] We note that plaintiffs' challenge to the CEP's qualification criteria would have been more compelling if there were evidence of a block of voters who would support a minor-party candidate if only the candidate could communicate to the voters using public funds. Such evidence, however, does not exist. Putting aside the *sui generis* candidacy of former Governor Lowell Weicker (who was, until running for governor on the "A Connecticut Party" line, a Republican), no minor-party candidate in Connecticut has won *any* election in recent memory. Indeed, although there were 179 minor-party candidates on the ballot in the three elections before the CEP went into effect, none of those candidates came close to winning an election (and only four of those candidates received more than 20% of the vote). *Green Party II*, 648 F. Supp. 2d at 322. The voters of Connecticut, therefore, have shown little inclination to support the candidacies of those running on the line of minor parties, and as a result, the political opportunity of minor-party candidates in Connecticut was, before the CEP, already insubstantial.

[14] Because the CEP's single-election qualification criteria survive plaintiffs' constitutional challenge, we do not discuss the CEP's separate petitioning criteria. That is, the existence of an *alternative* qualification method under the statute is irrelevant to our inquiry. Even if the petitioning criteria are too onerous for a minor-party candidate to achieve, the single-election criteria are *not*, on this record*, too onerous for a minor-party candidate to achieve, and thus there is insufficient evidence to conclude that the CEP impermissibly burdens the political opportunity of minor-party candidates.

33

In sum, although our intuition might suggest, as an abstract principle, that the CEP's single-election qualification criteria—20% of the vote for full funding, 15% for two-thirds funding, and 10% for one-third funding—come close to the outer edge of the constitutionally permissible range, the facts of record (most importantly, the 2008 election data) show that the qualification criteria are not so onerous as to deny funding to a sizeable number of minor-party candidates who enjoy substantial public support. Moreover, insofar as the CEP's single-election qualification criteria may impose *some* burden on the political opportunity of minor-party candidates, the 2008 election shows that minor-party candidates as a whole are arguably stronger—and certainly not weaker—under the CEP. There is, therefore, little reason to think that the CEP has burdened the political opportunity of minor-party candidates in a way that is unfair or unnecessary. Giving proper deference to the Connecticut General Assembly to choose qualification criteria that "best accommodate[ ] the competing interests involved," we "cannot say that" the General Assembly's "choice falls without the permissible range." *Id.* at 103-04.

Accordingly, we hold that plaintiffs have presented insufficient evidence on this record to establish that the CEP's single-election qualification criteria violate the First Amendment or the Equal Protection Clause. We therefore hold that the District Court erred in concluding that the single-election qualification criteria unconstitutionally discriminate against minor parties and their candidates.

## B. The Statewide Qualification Criteria

Plaintiffs also claim that the CEP's *statewide* qualification criteria, *see* Conn. Gen. Stat. § 9-702, impose an unfair or unnecessary burden on the political opportunity of minor-party candidates. The District Court agreed with plaintiffs, determining the statewide qualification criteria "substantially enhance[d] the relative strength of major party candidates compared to minor party candidates [by]

34

. . . encourag[ing] major parties to field candidates for historically uncompetitive seats, without regard to their likelihood of success." *Green Party II*, 648 F. Supp. 2d at 344.

The District Court's analysis focused on the effect of the statewide criteria in so-called *safe* or *uncompetitive* legislative districts, which are districts in which the candidate of one of the major parties is essentially assured of winning. In the state senate district encompassing New Haven, for example, less than 5% of all registered voters are Republican. *See id.* at 326 & n.33. Thus the New Haven state senate district is considered a *safe* district for the Democratic Party, since the Democratic candidate is almost certain to win the race for that seat.

The District Court observed that in safe districts, one of the major-party candidates (*e.g.*, the Republican candidate in New Haven) often fails to achieve 20% of the vote in an election and therefore would not qualify for CEP funding under the single-election qualification criteria. Under the statewide qualification criteria, however, that major-party candidate *would*, nevertheless, qualify for CEP funding, as the candidate would be on a ticket of a "major" party whose gubernatorial candidate achieved at least 20% of the vote in the last election. *See* Conn. Gen. Stat. §§ 9-372(5), 9-702. The District Court concluded, as a result, that the statewide qualification criteria "unfairly favor[ed] competition between major party candidates over competition from minor party candidates and thereby burden[ed] the political opportunity of minor party candidates." *Green Party II*, 648 F. Supp. 2d at 344.

Once again, we cannot agree with the District Court's application of law to fact.

### 1. There Is Insufficient Evidence to Conclude That the Statewide Qualification Criteria Have Imposed an Unfair or Unnecessary Burden on Minor-Party Candidates in Safe Districts

We acknowledge that *Buckley* did not address the unique circumstances created by safe districts, as safe districts are not a feature of nationwide presidential elections. We do not, however,

think that this is reason to abandon *Buckley*'s basic standard or analytical framework in assessing a burden on political opportunity.

Examining, then, the record evidence of how the CEP has affected minor-party candidates, we find insufficient evidence in the record to conclude that the CEP's statewide eligibility criteria has "reduce[d]" the "strength" of minor-party candidates in safe districts "below that attained without any public financing." *Buckley*, 424 U.S. at 99. To the contrary, as we set forth above, the record here reveals that minor-party candidates as a whole, many of them running in safe districts, appear to have done better in 2008, and certainly no worse. *See Green Party II*, 648 F. Supp. 2d at 323-24. Thus we cannot conclude, on this record, that the statewide eligibility criteria impose an unfair or unnecessary burden on minor-party candidates in safe districts.[15]

### 2. Even if We Were to Speculate About the Effect of the Statewide Qualification Criteria, Our Speculation Would Be Inconclusive

Even if we were to ignore *Buckley*'s guidance and engage in speculation (which we do not think is proper), we would lack confidence in any of our guesses about how the statewide eligibility criteria will affect the political opportunity of minor-party candidates in safe districts.

It is quite likely, for instance, that the statewide eligibility criteria will have no effect at all on the political opportunity of minor-party candidates in safe districts. The record shows that in the 2008 election, each major party appears to have been reluctant to field candidates in its opponent's safe districts. Indeed, although candidates from both major parties were eligible for full CEP funding in *every* district,[16] there were 72 General Assembly districts (out of a total of 187) in which

---

[15] Again, we do not rule out the possibility of reaching a contrary conclusion "in some future case, upon an appropriate factual demonstration." *Buckley*, 424 U.S. at 97 n.131.

[16] That is assuming that the candidate could meet the other eligibility criteria, such as collecting the required number of qualifying contributions.

one major party declined to field a candidate. *Green Party II*, 648 F. Supp. 2d at 324. The statewide qualification criteria can hardly be said to harm the political opportunity of minor-party candidates in safe districts if the major parties are not taking advantage of the statewide eligibility criteria to field publically financed candidates in those districts.

It is not at all certain, moreover, that providing public funds to a second major-party candidate will in any way affect the minor-party candidate's success at the polls. It may be that minor-party candidates have a core group of supporters that cannot be convinced to vote for a major-party candidate no matter how much money the major-party candidate spends.

It is also possible that the statewide eligibility criteria could actually *increase* the political opportunity of some minor-party candidates. Consider a safe Democratic district, such as the district encompassing New Haven. Funding a Republican challenger in that district may force the Democratic candidate to moderate her views and campaign closer to the "center" of the ideological spectrum. That could cause voters on the far "left" of the ideological spectrum to become disenchanted with the Democratic candidate and switch their votes to the Green Party candidate. There are, therefore, some situations in which providing CEP funding to a second major-party candidate may actually *help* a minor-party candidate at the polls.

Indeed, it is possible that the CEP's statewide eligibility criteria could *dramatically* improve the political opportunity of a minor party and thereby cause exactly the kind of political sea change that characterizes what *Buckley* called the "potential fluidity of American political life." 424 U.S. at 97 (quotation marks omitted). The only time in recent memory that a minor-party candidate has won an election in Connecticut was the election of Governor Lowell Weicker on the "A Connecticut Party" line in 1990. *See Green Party II*, 648 F. Supp. 2d at 325. If a minor-party candidate were able to match that achievement, then under the CEP his or her party would be deemed a "major" party

37

and would, in the next election, be able to field candidates and receive full CEP funding in *every* legislative and statewide election.[17]  Such an outcome could transform the once-minor, now-major party into a statewide political force, catalyzing the party's efforts to secure a permanent place as a third major party or, alternatively, providing the means for the party to supplant one of the two existing major parties.

What is more, in order to secure full funding in every legislative and statewide election under the CEP, a minor party need not field a *winning* candidate in the governor's race; the party need only field a candidate who earns twenty percent of the vote in that race.  *See* Conn. Gen. Stat. § 9-372(5). Thus, the CEP's statewide qualification criteria provide a path to state-wide viability by which minor parties can bypass the difficult process of building political support in each individual area of the state.  If a minor party can field a single gubernatorial candidate who earns twenty percent of the vote, the party will immediately have access to millions of public dollars to field candidates for each state office in the next election.  In that situation, the CEP's statewide eligibility criteria operate not as a *burden* but as a *boon* to minor parties that are able to achieve a small but significant measure of statewide support.

Of course, our analysis in this section has been speculation.  It is possible that under the CEP no minor-party candidate will ever achieve 20% of the vote in the gubernatorial election.  As the District Court reasoned, moreover, it is possible that, with the benefit of full CEP funding, a second major-party candidate in a safe district will significantly *reduce* the political opportunity of the minor-party candidates in that district.  But as we have explained, it is also possible that the statewide qualification criteria will increase the political opportunity of minor-party candidates,

---

[17] Again, that is assuming that the once-minor, now-major party's candidates could meet the CEP's other eligibility criteria.

possibly in dramatic fashion. Thus, even if we were to ignore *Buckley*'s guidance and speculate about the potential effect of the CEP's statewide qualification criteria on minor-party candidates, our speculation would yield no clear prediction.

*      *      *

In sum, we are presented with insufficient evidence that the CEP's statewide qualification criteria have, in practice, operated to reduce the strength of minor-party candidates in safe districts below that attained by such candidates before the system was put in place. Even if we were to speculate about the criteria's effects in safe districts, we would reach inconclusive results—the criteria may harm minor-party candidates, they may have no effect at all on minor-party candidates, and they may even help minor-party candidates. It is even possible that the CEP's statewide qualification criteria will dramatically increase the political opportunity of a minor party who gains a small but significant percentage of the vote in a gubernatorial election.

As *Buckley* made clear, when the General Assembly designed the CEP, it was able to choose from a "range of formulations" of qualification criteria that "would protect the public fisc and not foster factionalism" and yet "also recognize the public interest in the fluidity of our political affairs." 424 U.S. at 103-04. Because the CEP's statewide qualification criteria require a "substantial" showing of public support in a gubernatorial election, yet also provide for a dramatic expansion of a minor-party's political opportunity if it achieves that showing—and because there is insufficient evidence that the statewide qualification criteria impose an unfair or unnecessary burden on minor-party candidates in safe districts—we "cannot say," on this record, that the General Assembly's choice of statewide qualification criteria "falls without the permissible range." *Id.* at 104. We therefore hold that the District Court erred in concluding that the CEP's statewide qualification criteria unconstitutionally discriminate against minor parties and their candidates.

**C.    The Distribution Formulae**

Plaintiffs also challenge the CEP's distribution formulae, which are the formulae that establish the amount of money that participating candidates receive under the CEP.  As discussed above, the CEP provides, for general elections, full grant amounts of $85,000 to candidates for the Connecticut Senate and $25,000 to candidates for the Connecticut House.  *See* Conn. Gen. Stat. § 9-705(e)(2), (f)(2).  Those amounts are reduced in several circumstances, such as when a participating candidate is unopposed or is opposed by only a minor-party candidate.  *See id.* § 9-705(j).

The District Court found that the CEP's grant amounts—and corresponding expenditure limits—for the Connecticut Senate and House races were "based on the average expenditures in the most competitive races."  *Green Party II*, 648 F. Supp. 2d at 338.  The District Court concluded that "[p]egging the CEP's grant levels to the most competitive races has burdened minor party candidates' political opportunity because, by providing major party candidates financing in amounts much higher than typical expenditure levels, it slants the political playing field in favor of major party candidates."  *Id.*

It is true that the CEP's grant amounts and expenditure limits were based on historic expenditures in *competitive* districts, but we disagree with the District Court's conclusion that the grant amounts and expenditure limits impose a burden on minor-party candidates that is unfair or unnecessary.

Again following *Buckley*, we examine whether there is *evidence* that the CEP's distribution formulae have operated to reduce the strength of minor parties below that attained before the CEP was put in place.  *See* 424 U.S. at 98-99, 101; *see also* Count One, subsection II.A.2, *ante*.  And once again, examining the record, we can find no such evidence.  Based on data from the 2008 election,

40

the one election in which the CEP was operative, minor-party candidates as a whole are arguably stronger—and certainly no weaker—under the CEP. *See* Count One, subsection II.A.3, *ante*. There is, therefore, insufficient evidence in this record to conclude that any part of the CEP—including the distribution formulae—imposes a burden on minor-party candidates that is unfair or unnecessary.

The District Court was troubled by the fact that the CEP's distribution formulae provided major-party candidates in uncompetitive districts with more money in public funds than they "were able to raise" on their own "prior to the enactment of the CEP." *Green Party II*, 648 F. Supp. 2d at 339. As a result, the District Court determined that the CEP grants amounted to a *subsidy* for major-party candidates, rather than merely a *substitution* for private funds, and the District Court concluded that the CEP's expenditure limits did not represent "a true expenditure ceiling," at least for major-party candidates in uncompetitive districts. *Id.* at 340.

The problem with that reasoning is that it assumes that because a candidate *did not* raise a certain amount of money prior to the CEP that candidate was *unable* to raise that amount of money. It is far more likely that, before the CEP, candidates in safe districts—especially those favored to win—simply declined to raise every dollar possible, given that the outcome of the election was virtually certain. It is equally possible that donors were simply not interested in giving their money to a candidate who lacked any real competition at the polls. Indeed, if an election in a historically uncompetitive district were to become suddenly competitive—if, for example, a major-party incumbent were to face a strong challenge from a popular minor-party candidate—it is certainly possible that the major-party incumbent would be able to raise far more money than he or she had raised in the previous, *uncompetitive* elections in that district. We cannot conclude with any certainty,

41

therefore, that the CEP's distribution formulae provide a substantial number of major-party candidates with more money then they were *"able"* to raise before the CEP was enacted.

Furthermore, in determining that the CEP "slants the political playing field in favor of major party candidates," *id.* at 338, it seems that the District Court was referring only to the "political playing field" in uncompetitive districts. After all, in competitive districts, the CEP's distribution formulae provide a level of funding that is comparable to historic levels. It is, instead, only in *uncompetitive* districts that the CEP "provid[es] major party candidates financing in amounts much higher than typical expenditure levels." *Id.*

Yet if a district is uncompetitive, it is, by definition, a race in which minor-party candidates have no realistic chance of winning. Thus it is difficult to see how the political opportunity of a minor-party candidate in such a district could be unfairly or unnecessarily burdened by providing his or her opponent with additional funds. Put differently, if a district is truly *uncompetitive*, a minor-party candidate has no chance of winning, and he or she has very little political opportunity to be burdened.[18] If, however, a district is *competitive* in the sense that the minor-party candidate has some chance of winning, the CEP's funding levels are accurately calibrated.

In any event, the General Assembly's choice in setting the distribution formulae by reference to the historic expenditures in competitive districts strikes us as a reasonable approach. It is undoubtedly difficult to predict when a historically uncompetitive district will unexpectedly become competitive—when, for example, an incumbent will die or decline to seek reelection; when a popular challenger will enter a race to unseat an incumbent; or when the demographic characteristics

---

[18] We acknowledge that winning an election is not the only reason that citizens choose to run for office, and we do not mean to diminish the important role that minor-party candidates play in espousing minority views and shaping public debate. There is, however, insufficient evidence in the record to show that minor-party candidates need public money to perform that role.

42

of a district will change, making it no longer "safe" for one party. If the CEP were to make more of an attempt to differentiate between districts—providing more money in competitive districts and less money in uncompetitive districts—the CEP would risk providing too little funding to candidates in historically uncompetitive districts that had only recently become competitive. That could undermine public confidence in the outcome of elections, as a candidate who loses in an unexpectedly competitive election could plausibly blame the insufficient CEP funding for his defeat. It could also discourage candidates from participating in the CEP. Rather than accept a diminished CEP grant (with the accompanying expenditure limit), candidates could prefer to avoid participation in the CEP and retain the flexibility of raising so-called *competitive* amounts of money, lest they be left without sufficient funds if a popular challenger unexpectedly enters the race.

*     *     *

In sum, we acknowledge that, by providing funding comparable to competitive races in every legislative race, the General Assembly painted with a broad brush. But because the alternative—making fine adjustments based on a district's historic or expected competitiveness—is fraught with danger, and because there is insufficient evidence that the CEP's distribution formulae have reduced the strength of minor parties below that attained before the CEP became effective, we cannot conclude that the General Assembly violated the First or Fourteenth Amendments when it chose to treat every district as if it could, in any given election, involve a competitive race. We therefore hold that the District Court erred in concluding that the distribution formulae unconstitutionally discriminate against minor parties and their candidates.

**COUNTS TWO & THREE:** **Whether the CEP's Trigger Provisions Violate the First Amendment**

In Counts Two and Three, plaintiffs challenge the CEP's so-called "trigger provisions." As discussed above, the trigger provisions provide additional public funding to candidates when certain

43

conditions are triggered. The trigger provisions include the "excess expenditure provision" (Count Two) and the "independent expenditure provision" (Count Three).

The District Court struck down the trigger provisions, concluding that they imposed a "substantial burden on the exercise of First Amendment rights" and that "the state ha[d] failed to advance a compelling state interest that would otherwise justify that burden." *Green Party II*, 648 F. Supp. 2d at 373. We agree with those conclusions and affirm the District Court's judgment in favor of plaintiffs on Counts Two and Three.

## I.      Plaintiffs' Standing to Challenge the Trigger Provisions

As a threshold matter, defendants argue that plaintiffs lack standing to challenge the trigger provisions. We agree with the District Court, however, that plaintiffs do have standing on Counts Two and Three. *See Green Party II*, 648 F. Supp. 2d at 369-70.

"To qualify for standing, a claimant must present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling." *Davis*, 128 S. Ct. at 2768 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Defendants' primary claim is that plaintiffs have failed to allege an injury that is "concrete, particularized, and actual or imminent." *Id.*

With respect to the *excess expenditure* provision, plaintiffs have submitted very little evidence to suggest that any member of the Green Party or the Libertarian Party will ever raise enough money (or spend enough of his or her own money) to trigger the excess expenditure provisions. As discussed above, *see* Count One, section I, *ante*, *Davis* addressed the so-called "Millionaire's Amendment," which imposed a "penalty"—in the form of a disadvantageous "asymmetrical regulatory scheme"—on candidates for Congress who spent large amounts of their own money on their campaigns. *Id.* at 2766. *Davis* recognized that a potential candidate had standing to challenge

the Millionaire's Amendment where the candidate had "declared his candidacy and his intent to spend more than $350,000 of personal funds in the general election campaign." *Id.* at 2769. There, however, it was undisputed that the candidate's personal wealth was sufficient to enable him to spend more than $350,000 on his campaign. Here, by contrast, no plaintiff (or member of one of the plaintiff minor parties) has declared an intention to spend enough personal wealth to trigger the excess expenditure provision, and there is very little evidence to suggest that any minor-party candidate in Connecticut could plausibly raise enough money through private contributions to trigger the excess expenditure provision.

Nonetheless, the record shows that the Green Party does, on occasion, choose to endorse a major-party candidate for a particular office rather than run a candidate of its own (this is referred to as "cross-endorsement"). Insofar as the Green Party cross-endorses a major-party candidate who declines to participate in the CEP, the Green Party members may choose to make contributions to that candidate, and those contributions—combined with the candidate's other fundraising efforts—could cause the candidate to trigger the excess expenditure provision. Therefore, the existence of the excess expenditure provision could have the effect of chilling plaintiffs' contributions to cross-endorsed candidates. *See Green Party II*, 648 F. Supp. 2d at 368-69. We conclude that this injury is sufficiently "concrete, particularized, and . . . imminent" to provide plaintiffs with standing to assert Count Two.

The analysis is similar with respect to the *independent expenditure* provision. If the Green Party chooses to cross-endorse a major-party candidate, any independent expenditures made by the Green Party advocating for the defeat of the candidate's opponent could trigger the independent expenditure provision. We conclude, therefore, that the potential chilling effect on plaintiffs'

45

independent expenditures, *see id.*, is sufficient to provide plaintiffs with standing to assert Count Three.

## II. The Merits of Plaintiffs' Challenge to the Trigger Provisions

Turning to the merits of plaintiffs' challenge, we agree with the District Court that the CEP's trigger provisions violate the First Amendment because they operate in a manner similar to the law that the Supreme Court struck down in *Davis v. Federal Election Commission*, 128 S. Ct. 2759 (2008).

Federal law establishes certain restrictions on financial contributions given to candidates for Congress. For example, "[c]ontributions from individual donors during a 2-year election cycle are subject to a cap, which is currently set at $ 2,300." *Davis*, 128 S. Ct. at 2765-66 (citing 2 U.S.C. § 441a(a)(1)(A), (c)). The so-called "Millionaire's Amendment" at issue in *Davis* eased some of those restrictions for candidates whose opponents have spent more than $350,000 of their (the opponents') own personal funds in an election.

Consider, for instance, a race for Congress between Candidate A and Candidate B. The Millionaire's Amendment would apply if Candidate A were to spend $350,000 or more of her own money on her campaign. The Amendment at that point would ease certain restrictions for Candidate B. Most notably, Candidate B would be allowed to accept contributions from individual donors at three times the ordinary "cap"—$6,900 instead of $2,300. The restrictions would not, however, be eased for Candidate A, who would still be limited to accepting contributions at the $2,300 limit.

*Davis* emphasized, as an initial matter, that the Supreme Court had upheld contribution limits on individual donors. *See* 128 S. Ct. at 2770 ("This Court has previously sustained the facial constitutionality of limits on discrete and aggregate individual contributions and on coordinated party expenditures." (citing *Buckley*, 424 U.S. at 23-35, 38, 46-47 & n.53; *Fed. Election Comm'n v. Colo.*

46

*Republican Fed. Campaign Comm.*, 533 U.S. 431, 437, 465 (2001))). Thus *Davis* observed that if the Millionaire's Amendment had "simply raised the contribution limits for all candidates," the plaintiffs' challenge "would [have] plainly fail[ed]." *Id.*

But because the Millionaire's Amendment "raise[d] the [contribution] limits only for the non-self-financing candidate" (Candidate B in the example above), *Davis* held that the Amendment imposed "an unprecedented penalty on any candidate who robustly exercise[d]" his or her right, under the First Amendment, "to spend personal funds for campaign speech." *Id.* at 2771. Accordingly, *Davis* determined that the Millionaire's Amendment created "a substantial burden on the exercise of the First Amendment right to use personal funds for campaign speech," and held that the Millionaire's Amendment could be upheld only if it was "justified by a compelling state interest." *Id.* at 2772 (quotation marks omitted). Applying that standard, *Davis* struck down the Millionaire's Amendment, concluding that the asserted government interest—"to level electoral opportunities"—was not "compelling." *Id.* at 2773-74 (quotation marks omitted).

The Supreme Court's analysis in *Davis* directly governs plaintiffs' challenge to the CEP's trigger provisions in Counts Two and Three.

### A.     The Excess Expenditure Provision

The similarity between the claim in *Davis* and the claims raised by plaintiffs in Counts Two and Three is clearest with respect to the CEP's excess expenditure provision. Consider a race for a state office in Connecticut between Candidate A and Candidate B. Candidate A intends to spend her own money on the race and has, as a result, elected *not* to participate in the CEP. Candidate B, however, decides to participate in the CEP. Candidate B proceeds to qualify for the CEP, and he receives a full grant of public money and becomes subject to the CEP's expenditure limit.

Under the excess expenditure provision, if Candidate A spends so much of her own money on the race that her expenditures exceed Candidate B's expenditure limit, then Candidate B will receive additional public money to make up for the deficit. In other words, as Candidate A spends more and more of her own money above a certain threshold, Candidate B will receive more and more public money to compensate (up to *twice* the full CEP grant). That plainly causes Candidate A to "shoulder a special and potentially significant burden" if she chooses to exercise her First Amendment right to spend personal funds on her campaign, for Candidate A can only spend above the excess-expenditure threshold if she accepts that her opponent will receive additional public money. *Davis*, 128 S. Ct. at 2772. As a result, the excess expenditure provision imposes what can only be deemed a "penalty" on Candidate A's choice "to spend personal funds for campaign speech." *Davis*, 128 S. Ct. at 2771.

The "penalty" imposed by the excess expenditure provision is, to be sure, slightly different from the penalty imposed by the Millionaire's Amendment in *Davis*. We agree with the District Court, however, that insofar as the two penalties are different, the penalty at issue in this case is "more constitutionally objectionable." *Green Party II*, 648 F. Supp. 2d at 373.

In *Davis*, the "penalty" consisted of a "a new, asymmetrical regulatory scheme"—contribution restrictions were relaxed for the non-self-financed candidate. 128 S. Ct. at 2766. In *Davis*, therefore, there was some possibility that the non-self-financed candidate (Candidate B, above) would be unable to raise additional money under the relaxed restrictions.

Here, however, the "penalty" imposed by the excess expenditure provision consists of a "voucher" of public funds given directly to Candidate B. *See, e.g.*, Conn. Gen. Stat. § 9-713(a); *see also Green Party II*, 648 F. Supp. 2d at 373. The penalty imposed by the excess expenditure provision,

48

therefore, is *harsher* than the penalty in *Davis*, as it leaves no doubt that Candidate B, the opponent of

the self-financed candidate, will receive additional money.

Accordingly, the excess expenditure provision "imposes a substantial burden on the exercise

of the First Amendment right to use personal funds for campaign speech." *Davis*, 128 S. Ct. at 2772.

To be upheld under plaintiffs' First Amendment challenge, the provision must be "justified by a

compelling state interest." *Id.* (quotation marks omitted).

Applying that standard, we agree with the District Court that Connecticut's asserted

interest—"promot[ing] participation in the CEP"—is not compelling. *Green Party II*, 648 F. Supp.

2d at 373. *Davis* was clear that a "burden . . . on the expenditure of personal funds is not justified by

any governmental interest in eliminating corruption or the perception of corruption." 128 S. Ct. at

2773. Since the CEP is justified by a governmental interest in eliminating corruption or the

perception of corruption, pursuant to the Supreme Court's teaching in *Davis*, encouraging

participation in the CEP does not justify the burden on First Amendment rights caused by the

excess expenditure provision. Moreover, insofar as the excess expenditure provision is the result of

a desire "to level electoral opportunities," they are, under *Davis*, clearly unconstitutional. *Id.* at 2773

(quotation marks omitted).

Thus, we conclude, pursuant to *Davis*, that the CEP's excess expenditure provision violates

the First Amendment. We therefore affirm the District Court's judgment for plaintiffs on Count

Two.[19]

---

[19] The Ninth Circuit has recently upheld a "matching funds" provision of Arizona's public financing system that bears some similarity to the CEP's excess expenditure provision. *See McComish v. Bennett*, 605 F.3d 720 (9th Cir. 2010). We are not persuaded by the Ninth Circuit's opinion, which, we note, has been stayed by the Supreme Court pending a petition for a writ of certiorari. *See McComish v. Bennett*, No. 09A1163, 2010 WL 2265319 (U.S. June 8, 2010).

### B. The Independent Expenditure Provision

The only difference between the independent expenditure provision and the excess expenditure provision is the fact that independent expenditure provision applies to individuals and organizations who are not themselves *candidates* in any race. We do not think that this difference carries any significance, as nothing in *Davis* suggests that the "right to spend personal funds for campaign speech" is limited to *candidates only*. *Id.* at 2771.

Consider again the race between Candidate A and Candidate B. If a resident of the district strongly favors the election of Candidate A—and strongly disfavors the election of Candidate B—the resident may choose to spend his personal funds to advocate the defeat of Candidate B. Under the independent expenditure provision, however, if the amount of the resident's expenditure of personal funds—when combined with the amount of Candidate A's own expenditures—surpasses Candidate B's expenditure limit, the state will provide additional funding to Candidate B to make up for the supposed inequality.

In this way, the independent expenditure provision clearly acts as a "penalty" on the resident's choice "to spend personal funds for campaign speech." *Id.* at 2771; *see also Day v. Holahan*, 34 F.3d 1356, 1359-62 (8th Cir. 1994) (holding unconstitutional a similar law penalizing independent expenditures). As the resident spends more and more money advocating against the candidate he opposes, Candidate B, the state will give more and more money to that candidate.

Accordingly, like the excess expenditure provision, the independent expenditure provision "imposes a substantial burden on the exercise of the First Amendment right to use personal funds for campaign speech." *Davis*, 128 S. Ct. at 2772. To be upheld under plaintiffs' First Amendment challenge, the provisions must therefore be "justified by a compelling state interest." *Id.* (quotation marks omitted).

50

Applying that standard, we once again agree with the District Court that, under the principles enumerated by the Supreme Court in *Davis*, the state's asserted interests cannot justify the independent expenditure provision. *See Green Party II*, 648 F. Supp. 2d at 373. As discussed in connection with the excess expenditure provision, neither an interest in "eliminating corruption or the perception of corruption" nor an interest in " level[ing] electoral opportunities" can justify a "burden . . . on the expenditure of personal funds." *Davis*, 128 S. Ct. at 2773-74 (quotation marks omitted). Nor can such a burden be justified by the state's asserted interest in "promot[ing] participation in the CEP," *Green Party II*, 648 F. Supp. 2d at 373, as that interest merely derives from Connecticut's interest in establishing the CEP—that is, the state's interest in encourage participation in the CEP derives from its interests in eliminating corruption or the perception of corruption.

Thus, we conclude that the CEP's independent expenditure provision violates the First Amendment as it is construed by the Supreme Court in *Davis*. We therefore affirm the District Court's judgment for plaintiffs on Count Three.

## III.    The Severability of the Trigger Provisions

Having determined that CEP's trigger provisions—that is, the excess expenditure provision and the independent expenditure provision—violate the First Amendment, we must determine whether the trigger provisions are severable from the CEP or whether the entire CEP must be struck down along with those provisions.

Defendants argue that the Connecticut General Assembly designed the CEP so that many of its individual provisions could be severed. Plaintiffs respond that one section of the larger CFRA suggests that the General Assembly intended the entire law to rise and fall together. That statute, which was recently amended, now reads in full:

> (a) If, during a period beginning on or after the forty-fifth day prior to any
> special election scheduled relative to any vacancy in the General Assembly

51

and ending the day after such special election, a court of competent jurisdiction prohibits or limits, or continues to prohibit or limit, the expenditure of funds from the Citizens' Election Fund established in section 9-701 for grants or moneys for candidate committees authorized under sections 9-700 to 9-716, inclusive, for a period of seven days or more, (1) sections 1-100b, 9-700 to 9-716, inclusive, 9-750, 9-751 and 9-760 and section 49 of public act 05-5 of the October 25 special session shall be inoperative and have no effect with respect to any race of such special election that is the subject of such court order until the day after such special election, and (2) (A) the amendments made to the provisions of the sections of the general statutes pursuant to public act 05-5 of the October 25 special session shall be inoperative until the day after such special election with respect to any such race, (B) the provisions of said sections of the general statutes, revision of 1958, revised to December 30, 2006, shall be effective until the day after such special election with respect to any such race, and (C) the provisions of subsections (g) to (j), inclusive, of section 9-612 shall not be implemented until the day after such special election with respect to any such race.

(b) Except as provided for in subsection (a) or (c) of this section, if, on or after April fifteenth of any year in which a state election is scheduled to occur, a court of competent jurisdiction prohibits or limits, or continues to prohibit or limit, the expenditure of funds from the Citizens' Election Fund established in section 9-701 for grants or moneys for candidate committees authorized under sections 9-700 to 9-716, inclusive, for a period of thirty days or more, (1) sections 1-100b, 9-700 to 9-716, inclusive, 9-750, 9-751 and 9-760 and section 49 of public act 05-5 of the October 25 special session shall be inoperative and have no effect with respect to any race that is the subject of such court order until December thirty-first of such year, and (2) (A) the amendments made to the provisions of the sections of the general statutes pursuant to public act 05-5 of the October 25 special session shall be inoperative until December thirty-first of such year, (B) the provisions of said sections of the general statutes, revision of 1958, revised to December 30, 2006, shall be effective until December thirty-first of such year, and (C) the provisions of subsections (g) to (j), inclusive, of section 9-612 shall not be implemented until December thirty-first of such year. If, on the April fifteenth of the second year succeeding such original prohibition or limitation, any such prohibition or limitation is in effect, the provisions of subdivisions (1) and (2) of this section shall be implemented and remain in effect without the time limitation described in said subdivisions (1) and (2).

(c) If, during a year in which a state election is held, on or after the second Tuesday in August set aside as the day for a primary under section 9-423, a court of competent jurisdiction prohibits or limits the expenditure of funds from the Citizens' Election Fund established in section 9-701 for grants or moneys for candidate committees authorized under sections 9-700 to 9-716,

inclusive, for a period of fifteen days, or if said Tuesday occurs during a period of fifteen days or more in which period such a court continues to prohibit or limit such expenditures, then, after any such fifteen-day period, (1) sections 1-100b, 9-700 to 9-716, inclusive, 9-750, 9-751 and 9-760 and section 49 of public act 05-5 of the October 25 special session shall be inoperative and have no effect with respect to any race that is the subject of such court order until December thirty-first of such year, and (2) (A) the amendments made to the provisions of the sections of the general statutes pursuant to public act 05-5 of the October 25 special session shall be inoperative until December thirty-first of such year, (B) the provisions of said sections of the general statutes, revision of 1958, revised to December 30, 2006, shall be effective until December thirty-first of such year, and (C) the provisions of subsections (g) to (j), inclusive, of section 9-612 shall not be implemented until December thirty-first of such year. If, on the April fifteenth of the second year succeeding such original prohibition or limitation, any such prohibition or limitation is in effect, the provisions of subdivisions (1) and (2) of this section shall be implemented and remain in effect without the time limitation described in said subdivisions (1) and (2).

(d) Any candidate who has received any funds pursuant to the provisions of sections 1-100b, 9-700 to 9-716, inclusive, 9-750, 9-751 and 9-760 and section 49 of public act 05-5 of the October 25 special session prior to any such prohibition or limitation taking effect may retain and expend such funds in accordance with said sections unless prohibited from doing so by the court.

Conn. Gen. Stat. § 9-717 (as amended by Public Act 10-2 on April 14, 2010).

Because the District Court struck down the entire CEP, it had no occasion to determine whether the trigger provisions were severable. We therefore remand to the District Court to consider the severability issue in the first instance. Because the meaning of § 9-717 is far from clear, the District Court should develop the record to determine how § 9-717 applies given our judgment for defendants on Count One and our judgment for plaintiffs on Counts Two and Three.

**CONCLUSION**

In summary, we hold as follows:

(1) When deciding whether a system of public financing for campaigns unconstitutionally discriminates against minor-party candidates, a court should first apply the version of "exacting

53

scrutiny" set forth in *Buckley v. Valeo*, 424 U.S. 1, 95-96 (1976). The court should ask (a) whether the public financing system was enacted in furtherance of a sufficiently important governmental interest, and (b) whether the system burdens the political opportunity of a party or candidate in a way that is unfair or unnecessary. *See id.* If the system survives under that version of the exacting scrutiny standard, the system should be upheld. If the system does not survive under that version of the exacting scrutiny standard, the court should finish the line of reasoning that *Buckley* left unresolved and determine whether a less searching standard applies.

(2) Assuming, for the sake of analysis, that the version of "exacting scrutiny" set forth in *Buckley* applies to plaintiffs' claim that Connecticut's Citizen Election Program (CEP) unconstitutionally discriminates against minor parties and their candidates, we hold that the Connecticut General Assembly enacted the CEP "in furtherance of sufficiently important governmental interests." 424 U.S. at 95-96. We also hold that there is insufficient evidence on this record to demonstrate that the CEP has "operat[ed] to reduce [the] strength" of minor-party candidates in Connecticut "below that attained without any public financing." *Id.* at 98-99. We conclude, as a result, that there is insufficient evidence to show that the CEP's qualification criteria and distribution formulae have "burdened the political opportunity" of minor-party candidates in a way that is "unfair[ ]" or "unnecessar[y]." *Id.* at 95-96. Accordingly, we reverse the judgment of the District Court on Count One and enter judgment on that Count for defendants.

(3) Plaintiffs have standing to challenge the CEP's "trigger provisions"—which provide additional public funding to candidates when certain conditions are triggered—because those provisions have a potential chilling effect on (a) plaintiffs' practice of providing direct contributions to cross-endorsed, major-party candidates and (b) plaintiffs' practice of making independent expenditures in support of cross-endorsed, major-party candidates.

54

(4) The CEP's trigger provisions impose a "penalty" on the right of candidates and other individuals and organizations "to spend personal funds for campaign speech." *Davis v. Fed. Election Comm'n*, 128 S. Ct. 2759, 2771 (2008). As a result, the trigger provisions violate the First Amendment unless they are "justified by a compelling state interest." *Id.* at 2772 (quotation marks omitted). In the case before us, the state's asserted interests—promoting participation in the CEP and eliminating corruption or the perception of corruption—are not sufficiently "compelling" to justify a burden on the right to spend personal funds for campaign speech. *See id.* at 2773-74. Accordingly, the trigger provisions violate the First Amendment, and we affirm the District Court's judgment for plaintiffs on Counts Two and Three.

(5) We remand the cause to the District Court to determine, in the first instance, whether the trigger provisions are severable from the remainder of the CEP and the CFRA. To that end, the District Court should develop the record to determine the effect of Conn. Gen. Stat. § 9-717, given our judgment for defendants on Count One and our judgment for plaintiffs on Counts Two and Three. The District Court should also conduct any other proceedings, consistent with this opinion, that may be appropriate or necessary.

(6) The District Court permanently enjoined defendants from enforcing the CEP, but with the consent of all parties, the District Court stayed that injunction pending this appeal. *See Green Party of Conn. v. Garfield*, No. 3:06-cv-01030, Docket Entry No. 399 (D. Conn. Sept. 29, 2009). We now vacate the permanent injunction entered by the District Court and instruct the Court to reconsider the scope of the injunctive relief necessary in this action in light of our holdings in this opinion and the District Court's resolution of the severability issue on remand.

\*     \*     \*

55

The September 2, 2009 judgment of the District Court on Counts One, Two, and Three of this action is **AFFIRMED** in part (with respect to Counts Two and Three), **REVERSED** in part (with respect to Count One), and the cause is **REMANDED** to the District Court for further proceedings in accordance with the instructions set forth above.

Recognizing that an election has been scheduled for November 2, 2010, and given the importance of this case to ongoing campaigns for state office, we request that the District Court act expeditiously in considering the issues presented for decision on remand.

KEARSE, Circuit Judge, dissenting in part:

I join so much of the majority's opinion as affirms the district court's judgment as to Counts Two and Three; but I respectfully dissent from the reversal with respect to Count One, which challenged so much of the Citizens' Election Program ("CEP") as provides for the funding of candidates for the Connecticut State legislature on the basis of their parties' performance in the prior gubernatorial election.

Under the CEP, a candidate for the legislature whose party garnered less than 20% of the vote in the prior gubernatorial election is not eligible to receive the maximum level of public funding for the legislative election if that party failed to win (and failed to collect petition signatures equaling) at least 20% of the votes cast in the prior election for that legislative seat. In contrast, a candidate for the same legislative seat whose party similarly failed to win at least 20% of the votes in the prior election for that legislative seat is eligible to receive the maximum level of public funding for the legislative election if his or her party won at least 20% of the vote in the prior gubernatorial election. With respect to public support in such a legislative district, as neither candidate's party has received 20% of the vote the candidates are similarly situated.

Yet under the CEP one candidate would receive a far larger grant of public funding than the other.

A candidate's First Amendment rights are burdened when the state provides funds only, or in a greater amount, to his or her opponent, thereby increasing the opponent's relative position. See Davis v. FEC, 128 S. Ct. 2759 (2008). In considering

> a challenge to a state election law [a court] must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

Burdick v. Takushi, 504 U.S. 428, 434 (1992) (quoting Anderson v. Celebrezze, 460 U.S. 780, 789 (1983) (emphasis ours)). The State of Connecticut has an obviously significant and important interest in preventing corruption or the appearance of corruption. But no one has explained why the measurement of candidates' eligibility for public funds in a local election for a legislative seat by reference to their parties' prior vote-garnering performance in a different election, i.e., the previous statewide race for governor, is necessary.

The majority's reliance on Buckley v. Valeo, 424 U.S. 1, 85-108 (1976), seems to me misplaced since that case involved only campaigns for the same office, the presidency; thus, only elections that were comparable provided the measure for determining whether and to what extent the various parties in Buckley were entitled to public funds. Shortly after the Supreme

- 2 -

Court decided Buckley, it decided Bang v. Noreen, 436 U.S. 941 (1978), in which it summarily affirmed Bang v. Chase, 442 F. Supp. 758 (D. Minn. 1977) (three-judge court), which had struck down a Minnesota statute giving public funds to local legislative candidates based on the public support of their parties statewide, because "the aggregate political party preferences expressed by all the state taxpayers in Minnesota have no rational relation to the support for particular parties or for particular candidates within legislative districts," 442 F. Supp. at 768. Although "the precedential effect of a summary affirmance extends no further than the precise issues presented and necessarily decided by those actions," Anderson, 460 U.S. at 784 n.5 (internal quotation marks omitted), such a decision does endorse what was "necessarily decided," id. (internal quotation marks omitted). In Bang, the district court held that giving public funds to local legislative candidates based on the public support of their parties statewide "invidiously discriminates between candidates of different political parties and abridges the First Amendment right of political association." 442 F. Supp. at 768. I see no reason to believe that the Supreme Court's summary affirmance did not endorse this holding, which seems applicable to the Connecticut scheme.

In sum, I would affirm the district court's ruling on Count One, that the CEP grant-eligibility requirements based on mismatched election races are not necessary to achieve the State's goals.